**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar RAMIREZ and Leonelo Sanchez,
Defendants-Appellants.**

**No. 74–3045.**

United States Court of Appeals,
Fifth Circuit.

May 19, 1975.

Rehearing and Rehearing En Banc
Denied June 18, 1975.

---

Nago L. Alaniz, Marvin Foster, San Diego, Tex:, Michael Anthony Maness, Houston, Tex., for Ramirez.

Roberto J. Yzaguirre, Knox Jones, McAllen, Tex., for Sanchez.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., John Patrick Smith, Asst. U. S. Atty., Brownsville, Tex., Mary Sinderson, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before BELL, THORNBERRY and GEE, Circuit Judges.

GEE, Circuit Judge:

Oscar Ramirez and Leonelo Sanchez, among others, were charged in a two-count indictment with possession with intent to distribute approximately 1,300 pounds of marihuana [1] and with conspiracy to possess with the intent to distribute the same marihuana.[2] Both waived jury trial and were tried before the court on stipulated evidence. Sanchez' conspiracy count was dismissed. Ramirez, however, was tried and convicted on both counts. Sanchez was sentenced to four years' imprisonment and a two-year special parole term and fined $10,000 while Ramirez received two four-year terms of incarceration to be served consecutively and a two-year special parole term and was fined $10,000. Both appeal their convictions.

Before trial and the stipulation of evidence Ramirez and Sanchez moved to exclude from evidence the 1,300 pounds of marihuana, which they maintained was seized by D.E.A. agents following an illegal search. They admit that the agents who searched their truck had probable cause to believe marihuana was concealed in it; they argue, however, that the agents should have obtained a warrant before conducting their search since

---

1. A violation of 21 U.S.C. § 841(a)(1).

2. A violation of 21 U.S.C. § 846.

exigent circumstances were absent. They point out that four days before the search D.E.A. agents knew the marihuana would be transported from South Texas to Hillsboro, a town south of Dallas, by truck. Moreover, they had a description of the truck, knew its license number, knew the name of its driver, and knew where and how the marihuana was to be concealed within it. In addition to this four-day grace period, during the ten hours preceding the search D.E.A. agents had been trailing the truck as it proceeded from South Texas towards Hillsboro. Ramirez and Sanchez contend, therefore, that this is the case postulated in the dicta of Carlton v. Estelle, 480 F.2d 759, 762–63 (5th Cir.), cert. denied, 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973), since the D.E.A. "had probable cause for search before their arrival on the scene, knowledge of factors bearing upon the likelihood of future movement, and time enough and assurance enough to obtain a warrant beforehand," and thus missed a genuine opportunity to obtain a valid warrant authorizing the search of their truck. Further examination of the facts brought out at the suppression hearing, however, shows that the reliance which Ramirez and Sanchez place upon Carlton v. Estelle is reliance misplaced.

Ramirez and Sanchez were caught by what, until the evening of the search of their truck, was a well-planned and smooth D.E.A. operation. On October 16, 1973, in Mission, Texas, an undercover agent of the D.E.A. negotiated with Ramirez and Sanchez for the purchase of approximately 1,500 pounds of marihuana. The dope was to be transported by truck from the Mission/McAllen area to a motel just off Interstate Highway 35 in Hillsboro. There the undercover agent, who was the agent in charge of the operation, was to take delivery. The truck and a car left South Texas on the morning of October 20 with D.E.A. agents shadowing. The agent in charge, who had spent most of the day testifying in court in Dallas, drove to Hillsboro that evening to be in position for the delivery. When he arrived there between 8:30 and 9:00 p. m., however, he observed that the pre-arranged delivery spot, the motel, was not a favorable location for conducting a night-time operation. He then altered plans and proceeded south along I–35. The agent and the truck, along with its entourage, arrived in Waco at approximately the same time, about 10:00 p. m. There the truck stopped at a filling station and its occupants, as well as the occupants of the accompanying car, at a cafe. There the D.E.A. agents, who had abandoned their plan to take actual delivery of the marihuana at Hillsboro on radioed command of the case agent, arrested the occupants and searched the truck.

That the D.E.A. agent in charge may have had both sufficient time and probable cause to have obtained a warrant to search appellants' truck at Hillsboro has no bearing on whether exigent circumstances existed at Waco. Even if the bypassing of a genuine opportunity to obtain a search warrant is destructive of exigent circumstances, a proposition of extremely doubtful validity in light of the plurality opinion in Cardwell v. Lewis, 417 U.S. 583, 595, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325, 338 (1974), no genuine opportunity was bypassed here. This is so because the D.E.A. agents never intended to search appellants' truck at Hillsboro. They anticipated, rather, that the marihuana would be handed over to them and that a search warrant, therefore, would be unnecessary. We refuse to hold, as appellants have suggested, that the search at Waco was invalid because the D.E.A. agent in charge *could* have obtained a warrant for a search in Hillsboro which was never projected and never occurred. Needless to say, there is no requirement, constitutional or otherwise, that in order to validate unforeseen but possible searches law enforcement officials must obtain search warrants when the operation being conducted does not contemplate a search. The arrest of appellants and the search of their truck at Waco was made necessary by a change in the D.E.A.'s plan of operation. The necessity for the change did

not become apparent until an hour or an hour and a half before the arrest and search. From the time that the D.E.A. agent in charge realized that the Hillsboro motel was an unfavorable location for a nighttime operation until the time of the search, it cannot be said that the D.E.A. missed any genuine opportunity to obtain a warrant for the search of appellants' truck. The search of the truck at Waco was well within the parameters of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

In addition to the joint illegal search-and-seizure complaint, Ramirez, alone, contends that his convictions must be reversed in whole or in part because (1) the evidence does not support his conviction for conspiracy to possess with intent to distribute the marihuana, (2) the trial court judge, who was the factfinder, read his presentence report prior to finding him guilty and (3) both the trial judge and counsel for the government failed "to satisfy their affirmative constitutional obligation to disclose critically significant extrajudicial facts within their knowledge that were unknown to the defense and that, if known, would have had a material bearing on the decision to waive trial by jury and to stipulate the evidence." Prior to discussing these points we must highlight some of the events surrounding the somewhat peculiar trial of Ramirez.

Ramirez and Sanchez were originally indicted along with several other co-defendants in Waco. Another group of defendants, which included Ramirez' brother Rene, allegedly involved in the same transaction, was indicted in Brownsville. In response to a motion filed pursuant to Rule 21(b) of the Fed.R.Crim.P., the proceedings relating to the Waco indictment were transferred from the Western District of Texas to Brownsville, in the Southern District. Following transfer the trial judge denied a motion to consolidate and instead scheduled the trial of the Brownsville defendants for Thursday, July 18, 1974, and that of Ramirez and Sanchez for Monday, the 22nd. On Friday, Ramirez testified as a defense witness in the trial of his brother Rene. As a witness he denied that Rene was in any way involved but admitted his own complicity in the transaction.[3] Over the weekend, early Sunday morning, three unidentified gunmen fired a number of shots into a Brownsville motel room, seriously wounding a government undercover agent who had been a key witness at the trial of the Brownsville defendants and who was scheduled to testify against Ramirez and Sanchez on Monday. On Monday, Ramirez and Sanchez were brought to trial as scheduled. Sanchez waived trial by jury and agreed with the government to a stipulation of the evidence. Based upon the stipulated evidence the court found Sanchez guilty on Count 2 of the Waco indictment and granted the government's motion to dismiss Count 1. Sentencing was deferred until the conclusion of Ramirez' trial. Next Ramirez waived trial by jury and stipulated that all the witnesses who had participated in Friday's trial would, if called, testify as they had previously. Following this stipulation and before passing on the guilt or innocence of Ramirez, the court recessed to review its notes of the first trial. Court was reconvened that afternoon, and the judge found Ramirez guilty on both counts of the Waco indictment. Just after the adjudication of guilt the following colloquy took place between the court and several of the lawyers involved in the case:

> THE COURT: Will he [Sanchez] come forward, too, please. I did adjudge Leonelo Sanchez guilty this morning, did I not?
>
> MR. YZAGUIRRE: Yes, Your Honor.
>
> THE COURT: All right. Is there any reason why we cannot proceed with sentencing of both defendants?
>
> MR. YZAGUIRRE: No, Your Honor.

---

3. Rene was acquitted by a jury.

MR. FOSTER: Your Honor, at this juncture, may we inquire—not being familiar with the Court's usual procedure, will we be allowed an opportunity to examine the presentence investigation?

THE COURT: No. I will tell you that I do have presentence reports, and none of them are—I would say the one that relates to both of these defendants, neither of them, the defendants appears to have any prior criminal record, is that true?

MR. FOSTER: That is true, my understanding.

MR. YZAGUIRRE: That is true, yes, sir.

MR. FOSTER: But may Your Honor—may the record show the point in time—since these were reports, as I understand it, by agreement of the defendants that were prepared prior to trial—

THE COURT: Yes, sir.

MR. FOSTER: —may the record simply show from the report to what time those were delivered to the Court in this case since the Court itself passed on the question of guilt or innocence?

THE COURT: Well, I received these after our recess at noon today, and I have them available. I have reviewed the one with respect to Leonelo prior to this moment because, of course, he had been adjudged earlier. I would like to take a few moments and look further and see if there is anything different in this report. It virtually covered both of them. I'm looking to be sure. So I'll take a short recess. I might say I have received from Counsel or some—I guess it was Counsel—copies of letters of recommendation with respect to Oscar Ramirez.

MR. FOSTER: Well, we made no inference at all, Your Honor. It's just our understanding that in a case like this that the report should not actually come to the Court's attention, as such, until after a finding of guilt or innocence, and I'm sure that was the manner the Court handled it, but I did want it in the record.

THE COURT: Yes. All right.

■ Ramirez' contention that his conviction must be reversed because the trial court violated Rule 32(c) of the Federal Rules of Criminal Procedure by reading his presentence report prior to adjudicating his guilt is simply answered. As the record clearly indicates, it was the presentence report of Sanchez and not that of Ramirez which the court viewed prior to the latter's conviction. Thus, even if Gregg v. United States, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969) does create a *per se* rule that a court's reading of a defendant's presentence report prior to a finding of guilt is reversible error, that rule would be inapplicable here. *Cf.* United States v. Duhart, 496 F.2d 941 (9th Cir.), cert. denied, 419 U.S. 967, 95 S.Ct. 230, 42 L.Ed.2d 182 (1974).

■ We have reviewed Sanchez' presentence report. It consists of what are essentially three separate documents. One summarizes Sanchez' personal history and does not relate to Ramirez at all. The second is a report of the "official version" of the offense. It naturally covers Ramirez' participation in the crime. The third is a recommendation for sentencing which covers Ramirez, his brother Rene and Sanchez and which strongly implies that the brothers had, for a long period of time, been heavily involved in major marihuana trafficking in South Texas. This third document is styled Re: Rene Ramirez, Oscar Ramirez, Leonelo Sanchez. It should *not* have been included in Sanchez' presentence report,[4] and it should not have

---

**4.** An identical document, a Xeroxed copy, was included in Ramirez' presentence report. In the future, in order to avoid problems similar to the one which we face here, those preparing presentence reports in cases involving multiple defendants should sanitize all documents—except the official version of the offense—included in an individual defendant's presentence re-

been read by the court prior to the adjudication of Ramirez' guilt. However, here there is no possibility that the error was harmful. Ramirez, in his brother's trial, had taken the stand and admitted his complicity in the scheme to sell marihuana to the undercover agents. At his own trial he stipulated that if called to the stand he would again admit his guilt. Without abandoning the law and sanity, it would have been impossible for the court to have found Ramirez innocent.

■ Ramirez next contends that it was error for the court to find him guilty of participating in a conspiracy to possess the 1,300 pounds of marihuana with the intent to distribute it because it is undisputed that the weed was possessed, half by him and half by Sanchez, before their agreement to pool their resources and distribute them to the undercover agents. He argues that neither he nor Sanchez may correctly be found guilty of conspiring to possess a thing, all of which was owned and possessed by them, albeit severally, prior to the agreement to distribute. This argument misses the mark, for it focuses too closely on the word *possess* and erroneously interprets its contextual meaning. Ramirez was indicted for conspiracy to possess with the intent to distribute, not for conspiracy to obtain possession of. All that the government was required to prove

was that Ramirez was party to an agreement which contemplated that the 1,300 pounds of marihuana would be held for distribution.[5] This it did.

■ Ramirez' final contention is that his conviction should be reversed because no one told him that one of the government's key witnesses would be unavailable for trial. He says that had he known of the government's problem he would not have waived jury trial and entered into a stipulation of the evidence. He is, in essence, asking us to extend Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to force the government to disclose not only all information in its possession which exculpates the defendant but also all information it has which might influence a defendant's choice of tactics. This we refuse to do. Ramirez' waiver of his right to a jury trial was knowing and intelligent, as was his decision to stipulate the evidence. He will not be heard to complain that he would have acted differently had he been informed of a weakness in the government's case against him. Requiring such disclosures is a far cry from *Brady,* which rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt.

Affirmed.

port, deleting all references to co-defendants, especially those relating to past criminal history or propensities. This is especially important when, as here, the report of one co-defendant is made available to the judge prior to the adjudication of guilt of another or others. We recognize, of course, that the official version of the offense will, of necessity, detail all co-defendants' alleged complicity in the crime. Because such an official version of the crime will likely be included in each defendant's presentence report, we feel that it would be better practice for the judge not to read the presentence report of any co-defendant prior to the adjudication of guilt of all defendants when, as here, such an adjudication is to be made in the immediate future. We do not mean to imply that the presentence report of a co-defendant should not include an official version of the offense or that the court should not read the

official version when co-defendants are to be tried at different times as when, for instance, one co-defendant pleads guilty and another or others exercise their right to a trial by jury.

5. Even if an agreement to obtain were an element of the crime of conspiracy to possess with the intent to distribute, that element is present here. Prior to the agreement between Ramirez and Sanchez to pool their resources, the undercover agents had made it clear to both that they were not interested in purchasing small quantities of marihuana. The agreement to pool made marketable the marihuana owned by each individual. It is clear that Ramirez and Sanchez conspired together to obtain possession of a marketable quantity of marihuana. That this marketable quantity was formed from the individual caches of each is immaterial.