UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard WASHINGTON and Stanley Jules Johnson,
Defendants-Appellants.

No. 76–1750.

United States Court of Appeals,
Fifth Circuit.

April 11, 1977.

322

John T. Mulvehill, Asst. Federal Public
Defender, La. (Court appointed), for Leon-
ard Washington.

John Volz, Federal Public Defender,
Richard T. Simmons, Jr., Asst. Federal Pub-
lic Defender, Arthur L. Harris, Sr., New
Orleans, La. (Court appointed), for Stanley
Johnson.

Gerald J. Gallinghouse, U. S. Atty., Er-
nest C. Chen, Asst. U. S. Atty., New Orle-
ans, La., for plaintiff-appellee.

Before BROWN, Chief Judge, AINS-
WORTH, Circuit Judge, and JAMESON *,
District Judge.

* Senior District Judge of the District of Mon-
tana, sitting by designation.

JAMESON, District Judge:

Appellants, Stanley Jules Johnson and
Leonard Washington, were convicted fol-
lowing a jury trial, on one count of armed
bank robbery and assault, in violation of 18
U.S.C. §§ 2, 2113(a), and 2113(d), and on one
count of kidnapping and murder incident to
bank robbery, in violation of 18 U.S.C.
§ 2113(e). Each appellant was sentenced to
99 years imprisonment. We affirm.

### Facts

At 11:35 A.M. on October 31, 1974, three
black men armed with handguns entered
the Bank of St. Charles in Boutte, Louisi-
ana. After forcing the bank employees and
a customer into the vault, the men robbed
the bank of $21,982.75, and left the scene in
a 1973 Mercury Comet (white with a brown
top), which had been parked in front of the
bank. Judy Gibbs, a witness who was
parked in front of the bank, saw three
black men leave the bank, get into the
Mercury Comet, back out "real fast" and
head west on Highway 90.

At about noon Joyce Bernard, who had
been driving west on Highway 90, turned
onto Bayou Gauche Road where she saw
two cars in the righthand lane (her lane) of
traffic—a late model two-toned compact
car and a larger late model white car. Two
black men stood between the cars convers-
ing. One of them entered the larger car,
drove past the compact, made a U-turn, and
stopped next to the compact. The other
man, who was wearing a red bandana
around his throat, a "multiple-colored flan-
nelette shirt", and a "little hat", squatted
down behind the trunk of the compact as if
he was "unlocking the trunk or fixing a
flat". Both men then drove off in the
larger car.[1]

Susan Lewis was also driving on Bayou
Gauche Road at about noon. As she
stopped behind a two-toned compact car
parked in the right lane in order to let a

1. It was stipulated that appellant Johnson
owned a white 1974 Chevrolet Malibu Super
Sport sedan.

truck pass from the opposite direction, she noticed blood dripping from the trunk of the car. Upon the arrival of police, the car's trunk was pried open, revealing the body of Irwin Brown, who had died of a gunshot wound in the head. The car was identified as a 1973 Mercury Comet belonging to Brown. Recovered from the roadside near the car were an orange hardhat, a red bandana, a glove, a blue workshirt, and a button identified as coming from the shirt. An examination of the car revealed a latent palm print on the right-front door handle, a spent .45 caliber shell casing, and the .45 caliber bullet which killed Brown.

The evidence disclosed that Irwin Brown, a customs broker and international freight forwarder in New Orleans, had a parking contract with the Holiday Inn on Royal Street and always parked his car, a white 1973 Mercury Comet with a brown top, there. On the morning of October 31, 1974, Brown followed his daily routine of dropping his son off at school and proceeding to work, but Brown never appeared for work.

Emile Carmouche, an employee of the Holiday Inn, testified that between 7:30 and 8:00 A.M. on October 31 he noticed two men, one wearing a red bandana on his head, enter the Holiday Inn from Exchange Alley and walk up the stairwell leading to the parking lot. Carmouche identified one of the men as appellant Washington, although he could not be "sure beyond a reasonable doubt".

Employees of the bank identified one of the robbers as wearing a "bluish-gray shirt" and another as wearing a "red scarf", an orange hardhat, and a flannelette shirt, black with red stripes. The articles of clothing found near the car on Bayou Gauche Road were identified by the employees as similar to those worn by the robbers. Two of the employees, Myra Fields and Mona Scott, testified that they had been shown photo spreads by the F.B.I. following the robbery and had identified the picture of Johnson as being similar to

one of the men involved. Mrs. Fields testified that, although she was not positive, Johnson "could be the person that had come to my window". Mrs. Scott identified Johnson in court as one of the robbers and testified that she was "about ninety per cent sure" of her identification. A third employee, Gilda Rachael, identified Johnson as "almost definitely" being one of the robbers, and testified that she had previously identified Johnson at a police lineup on May 20, 1975.

Althea Tolliver, a friend of Johnson and Washington, was called as a witness by the Government. Tolliver, on October 31, 1974, was awaiting trial on charges of armed robbery. She agreed with a Government detective to assist in this case in return for his assistance in the disposition of the charges against her. Tolliver testified that upon her release on bail, she met Johnson, who told her that he "knew just what went down" at the bank robbery. Johnson said that one of the women at the bank had on a blue dress and that he knew one of the black women who worked there but wasn't worried. He told Tolliver that her "pistol sure came in handy that day".[2] When Tolliver asked him for some money, Johnson replied: "Well, I don't have any right now. If you would have come to me a couple of weeks ago, I had a fist full of fifties . . . .."

Tolliver testified that she later met Washington. Upon being asked about the robbery, he said: "Well, I did it [but] I didn't get my share of the money". When asked about the guns used in the robbery, Washington replied: "I got a prettier .38 than your .45". Tolliver further testified that the hardhat was similar to one owned by Washington and that the workshirt was similar to one owned by Johnson.

A .45 caliber colt automatic pistol was received in evidence as Exhibit 17. Testimony revealed that the gun had been purchased from Gretna Gun Works, Inc. by Charles Strickland, who sold it to George

2. Tolliver testified that she had stolen a .45 caliber automatic pistol from J. Dudley Bruton, one of her prostitution clients, and had given it to Washington. Washington later told her that he had sold the gun to Johnson.

Evans, who in turn sold it to J. Bruton. As noted *supra*, Tolliver testified that she stole the gun from Bruton and gave it to Washington. She identified Exhibit 17 as similar to the gun she stole from Bruton. A firearms expert testified that the shell casing found in the trunk of the Mercury Comet had been fired from that pistol "to the exclusion of all other weapons in existence". He also testified that the slug recovered from the trunk could have been fired from the gun.[3]

A fingerprint expert testified that a latent palm print found on the right front door handle of Brown's Comet was definitely the palm print of Stanley Johnson. Records of South Central Bell Telephone Company showed that at 2:35 P.M. on October 31, 1974, Johnson made a person-to-person phone call from a phone booth in Luling, Louisiana, to his home in Marrero, Louisiana. The phone booth was three miles from Boutte on River Road, which connects Boutte with New Orleans.

Washington did not take the stand or call any witnesses. Johnson called several witnesses who testified that after 3:00 P.M. on the afternoon of October 31, 1974, Johnson had attended a football game and had helped a friend clean graves. Johnson himself testified about his activities on the afternoon of October 31, but could not recall what he had done that morning. He denied participating in the robbery of the Bank of St. Charles, denied making any statements to Althea Tolliver, and denied owning a .45 automatic. Johnson further testified that he didn't know how his palm print got on Brown's car.

### Comments by Court

■ Both appellants argue that the court erred in remarks concerning the acceptability of a proffered Government expert in lifting latent fingerprints. In accepting the

expert over defense counsel's objection that the witness was unfamiliar with leading texts and articles on the lifting of latent prints and was not an expert in the field of fingerprint analysis, the court stated:

"He's totally acceptable to the Court as an expert.

"I say that he has had more experience than any F.B.I. agent that's worth his salt.

"He's had more experience than any police officer who's worth his salt.

"He's had more experience than all of those nutty professors that you have talked about.

"It's done by the school of hard knocks, is where you learn to dust something and lift fingerprints, and not by some professor sitting in some university who doesn't know his neck from third base."

Johnson contends that these remarks denied him effective cross-examination of the expert's qualifications. Both appellants contend that the court's statement adversely affected the credibility of Johnson's expert witness, Dr. Elder, a psychologist and professor, who testified about the possibility of error in photographic identifications. Appellants claim that the court violated its duty to remain neutral and improperly trespassed on the jury's fact-finding duties. See *United States v. Williams*, 447 F.2d 894 (5 Cir. 1971).

While the remarks were unfortunate, viewing the record as a whole they do not constitute reversible error. First, they took but a few moments of a five day trial, concerned a procedural matter, and did not reflect on appellants' guilt or innocence. See *United States v. James*, 510 F.2d 546, 550 (5 Cir. 1975), *cert. denied* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1976). Second, the comments were made long before appellants' expert took the stand, and were not directed toward him.[4]

---

**3.** The expert also testified that two .45 cartridges given to the F.B.I. by Bruton had been inserted and extracted from Exhibit 17. He testified that these cartridges and the spent casing found in the Comet's trunk had been inserted in the same gun.

**4.** Moreover, immediately following the comments, the court admonished the jury:

"I want the Jury to understand that the Court's not vouching for the qualifications of this witness, for his testimony, or anything. I accept him as an expert.

## Comments by Witness

■ The Government's first witness was Sandra Brown, widow of the murder victim. Following her testimony, defense counsel asked that Mrs. Brown remain under subpoena and subject to the court's sequestration ruling. The Government objected, arguing that the defense could have asked anything they wanted of Mrs. Brown while she was on the stand, and the following colloquy ensued:

"THE COURT: All right.

"Mrs. Brown, you may go home if you wish, but you will remain under subpoena so that you can come back.

"THE WITNESS: Why can't I sit in here?

"THE COURT: You can't sit in the courtroom.

"THE WITNESS: They are doing that on purpose.

"THE COURT: There's a possibility that you will be recalled as a witness, therefore, you can't sit in the courtroom.

"THE WITNESS: They are doing that on purpose.

"THE COURT: Now, ma'am, that's not for you and me to say, I don't know, so—

"THE WITNESS: That's not right.

"THE COURT: All right. But, the circumstances are that you must stay out of the courtroom now.

"THE WITNESS: It's not fair.

"THE COURT: Well, you must stay out of the courtroom."

Defense counsel moved for a mistrial, which the court denied, stating: "I don't think that her outburst amounted to that much". Appellant Washington contends that the court erred in denying his motion for mistrial on the ground that Mrs.

Brown's remarks prejudiced the jury against the defense at the outset of the trial. He argues that the Government violated its duty of fairness in the prosecution of the case by making the objection which prompted the outburst. Washington contends that the court, *sua sponte*, should have taken steps to eliminate or cushion the effect of the remarks on the jury.

We disagree. This dialogue occupied only a moment of a lengthy trial and concerned a procedural issue. See *United States v. James, supra.* The witness's remarks were unsolicited by the Government. Any effect this incident may have had on the ultimate verdicts was minimal. Neither defense counsel requested any cautionary instructions. The court bears no duty, *sua sponte*, to give such instructions. We conclude that Washington was not substantially prejudiced by the unsolicited remarks of the witness.

## Suppression of Evidence

■ Johnson testified on cross-examination that he had never owned a .45 caliber pistol and had never kept any ammunition or holster in his house. Over defense objection, the Government rebutted Johnson's testimony by introducing a shoulder holster and .45 caliber bullet seized on May 19, 1975, from Johnson's bedroom pursuant to a search warrant. Johnson contends that the evidence seized in the search should have been suppressed and not used for impeachment because the affidavit made in support of the search warrant [5] did not establish probable cause. Relying on *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), Johnson argues that the affidavit did not state sufficient facts to establish the reliability of the informant.

"I accept him on the basis of his expertise, of his training, of his having done the thing over a period of thirteen years.

"I think he's certainly capable of examining, having been an expert in the field.

"Now, it's up to the Jury to give the weight that their—that they are going to give to his testimony, whether they believe it or not. I'm not vouching for him."

Furthermore, the court in its charge instructed the jury that they were the sole judges of the facts and were not to be influenced by the court's comments during trial.

5. Two search warrants were obtained, the other pursuant to an investigation in an unrelated murder case.

The affidavit was made by Detective Mitchell of the Jefferson Parish Sheriff's office. In addition to stating facts about other crimes in which Johnson was believed to be involved, Mitchell set forth in detail a conversation on April 15, 1975, between F.B.I. Agent Beinner, who was in charge of the investigation of this case, and an informant Beinner knew to be "reliable". The informant told Beinner that the informant was standing on a street corner on November 1, 1974, when Johnson and Washington drove up. Johnson displayed a .45 caliber pistol and told the informant that it had been used in the commission of an armed robbery of a bank near Hahnville, Louisiana. Johnson said that during the robbery, they had to place a man in the trunk of the car. While Johnson was telling the informant about the robbery, he suddenly remembered that he had left a blue shirt marked "Loop Uniform" on the inside at the scene of the abandoned getaway car and was afraid the shirt might be traced to him. Washington then became upset and advised Johnson to leave. Beinner corroborated the informant's information with facts discovered during the F.B.I. investigation of the armed robbery of the Bank of St. Charles and the murder of Irwin Brown. Affiant stated that these facts "were not publicized and were known only to investigators and the perpetrator".

We conclude that the affidavit alleged facts sufficient to meet the "substantial basis" test of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). In *Jones,* the Court stated that "[a]n affidavit is not to be deemed insufficient" because it sets out observations by someone other than the affiant, "so long as a substantial basis for crediting the hearsay is presented". 362 U.S. at 269, 80 S.Ct. at 735. The Court continued:

"[W]e have held that [an officer] may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327." 362 U.S. at 269, 80 S.Ct. at 735.

The Court found a "substantial basis" for crediting the hearsay in the search warrant affidavit because the informant had previously given accurate information, his story was corroborated by "other sources", and the defendant was known to the police as a user of narcotics.

*United States v. Harris* concerned the sufficiency of an affidavit for a search warrant based on the hearsay statements of an unnamed informant whom the affidavit stated was a "prudent person", and on the affiant's knowledge of the defendant's reputation as a "trafficker of nontaxpaid distilled spirits". In finding probable cause for the issuance of a warrant based on the affidavit, the Court reviewed its holding in *Jones, supra,* and stated that "*Aguilar* cannot be read as questioning the 'substantial basis' approach of *Jones*". 403 U.S. at 581, 91 S.Ct. at 2081. The Court found that the affidavit, like the one in *Jones,* "contained a substantial basis for crediting the hearsay" because both affidavits purported "to relate the personal observations of the informant" and recited "prior events within the affiant's own knowledge"—factors "clearly distinguish[ing] *Spinelli*". It was held that an averment that the informant had previously given "correct information" was not necessary. The Court declined to follow *Spinelli* to the extent that it precluded reliance by a policeman on his knowledge of a suspect's reputation in assessing the reliability of the informant's tip. 403 U.S. at 583, 91 S.Ct. 2075.

The affidavit here provided a substantial basis for crediting the hearsay.[6] We hold

---

6. It may be noted also that the evidence relating to the search was introduced for impeachment purposes. In a different context the Court has recognized that evidence inadmissible in the prosecution's case in chief under the exclusionary rule may be used for impeachment purposes to attack the credibility of the defendant's trial testimony. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

that the search of Johnson's residence was made pursuant to a valid warrant and that the evidence obtained thereby was properly admitted for purposes of impeaching Johnson's testimony.

### Jury Instructions

■ Appellant Johnson contends that the court erred in refusing to instruct the jury on what he terms "the defendant's theory of the case", contained in his requested instructions VIII and IX. Requested instruction VIII reads:

"In order to convict the accused, each individual juror should arrive at the conclusion that the defendant has been proven guilty beyond a reasonable doubt, that is, each individual juror, 'and each juror' having in view the oath he had taken and his duty and responsibility thereunder should have his own mind convinced beyond a reasonable doubt upon all the evidence before he should consent to a verdict of guilty."

This requested instruction was fully covered by the court's charge that the Government bore the duty of proving each element of its case beyond a reasonable doubt and that each juror must independently reach his own conclusion. See *United States v. Garcia,* 531 F.2d 1303, 1307 (5 Cir. 1976). Proposed instruction VIII was properly refused.

■ The second paragraph of Johnson's proposed instruction IX reads:

"Further the defense theory of the case on the palm print is that the evidence produced did not establish how long the laten[t] prints had been on the car, or who the other prints on the car belonged to, therefore the evidence on the palm print is inconclusive. I charge you where any element of prosecution's rests on circumstantial evidence, such evidence may be a basis for conviction only if it shows complete inconsistency with innocence and excludes every reasonable hypothesis except that of guilt of the accused. This simply means that the prosecution must prove each and every link in its chain of evidence beyond a reasonable doubt, and if any one link in the chain has not been proved beyond such reasonable doubt, a verdict must be returned. In order to convict the defendant on circumstantial evidence, such evidence must be inconsistent with his innocence and fairly consistent with his guilt."

This instruction was also properly rejected. The first sentence is clearly a comment on the weight of the evidence. The remainder of the instruction deals with the "reasonable hypothesis" test. This court has consistently followed *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and held that such an instruction "is not required where there [are] adequate instructions on reasonable doubt". *United States v. Pipkins,* 528 F.2d 559, 564 (5 Cir. 1976), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). The jury here was adequately instructed on reasonable doubt.

### Sufficiency of the Evidence

■ Appellant Washington contends that the evidence is insufficient to support his conviction. He argues that Carmouche's identification testimony was so tentative as to raise only a suspicion that he could have been one of the robbers. Washington attacks the credibility of Althea Tolliver's testimony by reciting the evidence offered to impeach her.

Upon a review of the record and taking the evidence in the light most favorable to the Government, we conclude that there is sufficient evidence to sustain Washington's conviction. Tolliver testified that when asked about the bank robbery, Washington said "Well, I did it". In further conversation about the weapons used in the robbery, Washington stated that they were a .38 and "your [Tolliver's] .45". While there was evidence to impeach Tolliver's testimony, this evidence was argued at length by counsel and considered by the jury. The jury obviously believed Tolliver. Carmouche's identification of Washington as one of the two men who entered the Holiday Inn ga-

rage on the morning of October 31, 1974, while by no means positive, further implicated Washington. There was testimony that Washington owned an orange hardhat similar to that found near the murder victim's car. Although the evidence against Washington may not be overwhelming, we find it sufficient to establish Washington's guilt beyond a reasonable doubt.

### Motion for New Trial

Washington moved for a new trial on grounds that (1) comments made by Johnson's attorney in closing argument reflected on Washington's failure to testify, and (2) the court should have severed the trials of the two defendants. Washington claims error in the court's denial of his motion.

During his argument to the jury, counsel for Johnson referred to facts to which his client had testified during the trial. Washington contends that these references by inference drew the jury's attention to Washington's failure to testify and deprived him of the right to remain silent, thereby falling within the prohibition of *De Luna v. United States,* 308 F.2d 140 (5 Cir. 1962).

We find no merit in this contention. *De Luna* is distinguishable. There counsel for one defendant repeatedly commented on the failure of the co-defendant to testify. Here Johnson merely summarized the facts to which his client testified. He made no reference to Washington's failure to testify. It is clear from the holding of this court in *United States v. Hodges,* 502 F.2d 586, 587 (5 Cir. 1974) that *De Luna* is inapplicable. The court there said: "A mere favorable comment upon the fact that one of several co-defendants testified does not involve the same potential for prejudice as an adverse comment by counsel upon the failure to testify of the other co-defendant. We decline to extend *De Luna* to cover the situation."

Washington concedes that the "court did, in its general charge to the jury, correctly state the law regarding the failure of an accused to testify in his own behalf". This charge was sufficient.

Washington contended for the first time in his motion for a new trial that his trial should have been severed to avoid "the cascading effect of the evidence introduced against Stanley Johnson". Since he did not either before or during the trial move for a severance, to prevail on this issue now, Washington must demonstrate actual prejudice resulting from the failure to sever his trial from that of his co-defendant. *Tillman v. United States,* 406 F.2d 930, 934–935 (5 Cir. 1969), *vacated on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Washington has failed in this burden. Washington and Johnson were properly joined since both were involved in both counts of the indictment. See F.R.Crim.P. 8(b). Washington does not claim that his co-defendant had an antagonistic defense, or that the jury was confused by the number of defendants or issues. See *United States v. Larson,* 526 F.2d 256, 260 (5 Cir. 1976), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106. The law of this circuit is clear that "[a] defendant cannot claim prejudice from failure to sever merely because his likelihood of acquittal is not as great in a joint trial as in a separate trial". *United States v. Larson, supra* at 260.

Furthermore, the trial court properly instructed the jury on their duty to consider the guilt of each defendant separately. "[T]his instruction was given to the jury near the end of the judge's instructions, such that it cannot be argued that it did not make an impression on the jury." *United States v. Larson, supra* at 260. Washington has failed to demonstrate any actual prejudice. The trial court's denial of his motion for a new trial was clearly within its discretion.

### Brady Material

Following trial, defense counsel learned that a five thousand dollar reward had been offered for information leading to the arrest and conviction of those responsible for the robbery of the Bank of St. Charles and

the murder of Irwin Brown.[7] Upon learning of the reward, appellants moved for a new trial, contending that the Government had a duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to reveal the reward offer to the defense and argued that the Government's failure to do so denied them a fair trial. The court, following a hearing, denied the motions stating:

"I don't think that the government has the duty to disclose, but even if they had the duty, I don't think it would have made any difference, it was brought out to the jury that Althea Tolliver was paid a thousand dollars by the government and she entered into a plea or bargain for her testimony. It was all brought out to the jury."

The recent decision of the Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) controls our disposition of this issue. The Court there held that the *Brady* rule may apply in three different situations: (1) where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury"; (2) where there is a pretrial request for specific evidence; and (3) where there is no request or simply a general request for "all *Brady* material". With respect to the third category the Court recognized that, "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor".

The Court in *Agurs* held that, "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 96 S.Ct. at 2400. It was recognized that the courts "cannot consistently treat every nondisclosure as though it were error". The Court continued: "It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless error standard." *Id.* at 2401.

In discussing the "standard of materiality" which gives rise to a duty on the part of a prosecutor "to volunteer exculpatory matter to the defense", the Court said:

"It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 2401–2402.[8]

---

7. The reward was offered jointly by the Bank of St. Charles and the "Friends of Irwin M. Brown".

8. See also *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) which falls into the first category established by *Agurs.* The Government there failed to disclose to the defense that the Government's key witness had been promised immunity from prosecution in return for his testimony, despite the statement of the witness on cross-examination that "Nobody told me I wouldn't be prosecuted". In discussing the necessity for disclosure, the Court said:

"When the 'reliability of a given witness may well by determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue, su-*

*pra,* [*Napue v. Illinois,* 360 U.S. 264 (1959)] at 269, 79 S.Ct. 1173, 3 L.Ed.2d 317. We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' *United States v. Keogh,* 391 F.2d 138, 148 (CA 2 1968). A finding of materiality of the evidence is required under *Brady, supra,* 373 U.S. at 87, 83 S.Ct. [1194] at 1196. A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' *Napue, supra,* 360 U.S. at 271, 79 S.Ct. [1173] at 1178." 405 U.S. at 154, 92 S.Ct. at 766.

This court summarized the *Brady* rule in *Calley v. Callaway*, 519 F.2d 184, 223 (1975) as follows:

"The basic import of *Brady* is not that there is an abstract right on the part of the defendant to obtain all evidence possibly helpful to his case, but rather that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness. As we stated most recently in *United States v. Ramirez*, 5 Cir., 1975, 513 F.2d 72, 78, *Brady* 'rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt.' 513 F.2d at 78."

■ The parties stipulated that the reward offer had been published in four newspapers in New Orleans and St. Charles and telecast on a New Orleans station, and that the "Government did not solicit, was not a source of, nor was a party to the offer of reward". It was stipulated further that Althea Tolliver knew of the offer of reward; that attorneys for the Government were aware that she knew of the offer and "hoped to receive same"; and that attorneys for the Government informed the court and defense counsel immediately prior to trial, in response to a defense request for "*Brady*" material, that there was no *Brady* material. The defense was allowed "open file" discovery by the Government, but no reference to the award was contained in the file.

We question whether the reward offer under the circumstances was the type of "exculpatory evidence" contemplated by *Brady* and subsequent cases. This is not a case where the Government had "exclusive access" to and concealed evidence or information which would exculpate the defendant. The Government was not a party to the reward offer and did not participate in making or obtaining it. The reward offer did not directly exculpate the defendant. At most it cast further doubt on the credibility of Tolliver, admittedly a crucial witness.

■ In any event, from a review of the entire record, we are satisfied that the "omitted evidence", the reward offer, does not create "a reasonable doubt that did not otherwise exist". Althea Tolliver admitted that her motive for testifying was that she had made a plea bargain in a state case where she was charged with armed robbery.[9] She testified that her bond on the charge was reduced from $200,000 to $11,000, and that she was ultimately given a suspended sentence on a plea to a lesser charge. Tolliver further testified that she had received "a little over one thousand dollars" from the F.B.I. in return for the information she supplied. There was other testimony that Tolliver was a thief and had been a prostitute. The evidence provided a substantial basis for the impeachment of Tolliver's testimony and was extensively argued to the jury by all counsel. The jury was in a good position to assess Tolliver's credibility. In light of all the evidence, it is unlikely that evidence concerning the offer of reward would have affected the jury's determination of Tolliver's credibility or would have produced a "reasonable doubt" as to Washington's guilt. In the words of *Agurs*, "the mere possibility that [this] item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense".

While we are concerned about the Government counsel's remark in closing argument that Althea Tolliver "has got noth-

9. Tolliver testified:

"Well when the time came for me to go back to Court and—see, they started putting a lot of pressure on me, which I explained it to them, and I told them that I was—I wouldn't volunteer no information to them no matter what it took, because of fear on my life and because it—of emotional feelings involved, but when a push came to a shove, and I figured that it either had to by neck or their's, so I volunteered information that I had heard, and this is when they told me that if I volunteered this information for them, that the only deal they could make with me is to let me out on probation, active probation, that I make six thousand dollars restitution back to that jail, which I haven't made."

ing to gain by coming in here to testify", we do not think it requires a conclusion contrary to the one we reach here. This was an isolated comment upon which the Government did not elaborate. It was made in the middle of a lengthy argument on Tolliver's credibility and was not prominent in that context.

We conclude that the district court could properly find that the reward offer would not have "made any difference" and that under the criteria of *United States v. Agurs, supra,* the reward information was not required to be disclosed by the Government. The motion for a new trial was properly denied.

Affirmed.