**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank DIECIDUE, Larry Neil Miller, Frank Boni, Jr., a/k/a "Mustache Frankie," Manuel Gispert, Anthony Antone, and Homer Rex Davis, Defendants-Appellants.**

No. 76–4360.

United States Court of Appeals,
Fifth Circuit.

Oct. 1, 1979.

Henry Gonzalez, Tampa, Fla., for Diecidue.

James O. Brecher, Jacksonville, Fla. (Court-appointed), for Miller.

Paul Antinori, Jr., Tampa, Fla., for Davenport.

George D. Gold, Miami, Fla., for Boni.

B. Anderson Mitcham, Tampa, Fla. (Court-appointed), for Gispert.

James D. Arnold, Tampa, Fla., for Davis.

Robert W. Knight, Federal Public Defender, Tampa, Fla., for Antone.

Sidney M. Glazer, Katherine Winfree, T. George Gilinsky, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, SIMPSON and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this appeal we consider challenges to convictions for conspiracy and substantive crimes under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S. C.A. § 1961 *et seq.*, and various federally proscribed acts of racketeering.

The six defendants before us were among thirteen charged in a twelve-count indictment with offenses ranging over a period between May 1975 and May 1976.[1] Follow-

---

1. *INDICTMENT*

The Grand Jury charges:

COUNT ONE

1. From on or about May 30, 1975, and continuously thereafter up to and including the date of the filing of this indictment, in the Middle District of Florida and elsewhere,

FRANK DIECIDUE
VICTOR MANUEL ACOSTA
ANTHONY ANTONE
MANUEL GISPERT
ELLIS MARLOW HASKEW
BENJAMIN FOY GILFORD
LARRY NEIL MILLER
FRANK BONI, JR., a/k/a
 "MUSTACHE FRANKIE"
HOMER REX DAVIS
HARVEY DAVENPORT
GEORGE ABRAHAM DE FEIS
JAMES ROSATI, and
EDWARD STONE,

the defendants herein, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree together, . . . to commit certain offenses against the United States, to wit: to violate Title 18, United States Code, Section 1962(c).

2. It was a part of said conspiracy that the defendants were associated with an enterprise as defined by Section 1961(4), Title 18, United States Code, which enterprise was engaged in and the activities of which affected interstate commerce, to wit: a group of individuals associated in fact to engage in various criminal

Note 1—Continued

activities including (1) "contract" murders, . . . (2) armed robberies, . . . (3) possessing and dealing in narcotics, . . . (4) possessing and dealing in counterfeit United States currency, . . . (5) possessing and dealing in stolen United States Treasury bills, . . . (6) obstruction of justice, . . .

3. It was a further part of the conspiracy that the defendants would conspire to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activities.

4. It was a further part of the conspiracy that the defendants ANTHONY ANTONE, MANUEL GISPERT, ELLIS MARLOW HASKEW, and BENJAMIN FOY GILFORD solicited and received "contracts" to murder various individuals.

5. It was a further part of the conspiracy that the defendant FRANK DIECIDUE arranged for a murder contract on one Jose Manuel Garcia.

6. It was a further part of the conspiracy that the defendant VICTOR MANUEL ACOSTA hired the defendant ANTHONY ANTONE to arrange for the "contract" murder of Bernard Dempsey, Cesar Rodriguez, Richard Cloud, and others.

7. It was further a part of said conspiracy that VICTOR MANUEL ACOSTA, ANTHONY ANTONE, ELLIS MARLOW HASKEW, and BENJAMIN FOY GILFORD murdered Richard Cloud to prevent him from testifying . . . .

8. It was a further part of the conspiracy that the defendants ANTHONY ANTONE, MANUEL GISPERT, and ELLIS MARLOW HASKEW would obtain dynamite from the defendants FRANK BONI, JR., a/k/a "MUSTACHE FRANKIE", and HOMER REX DAVIS, and would manufacture destructive devices and triggering mechanisms to carry out the aforementioned "contract" murders.

9. It was a further part of the conspiracy that the defendants ELLIS MARLOW HASKEW, MANUEL GISPERT, BENJAMIN FOY GILFORD, and ANTHONY ANTONE would utilize automatic handguns, shotguns, high powered rifles, silencers, specially equipped vehicles, and explosive devices in their efforts to carry out various "contract" murders.

10. It was a further part of the conspiracy that the defendants ELLIS MARLOW HASKEW, BENJAMIN FOY GILFORD, and LARRY NEIL MILLER would commit various armed robberies to obtain money and other property in part to finance the murder operation.

11. It was a further part of the conspiracy that the defendants ANTHONY ANTONE, MANUEL GISPERT, VICTOR MANUEL ACOSTA, FRANK BONI, JR., a/k/a "MUSTACHE FRANKIE", ELLIS MARLOW HASKEW, and others engaged in the possession, sale and distribution of cocaine in part to supply their own narcotic use and in part to finance their various criminal activities.

12. It was further part of the conspiracy that the defendants ANTHONY ANTONE, JAMES ROSATI, GEORGE ABRAHAM DE FEIS, HARVEY DAVENPORT, LARRY NEIL MILLER, ELLIS MARLOW HASKEW, and others would fraudulently possess and distribute counterfeit United States currency in part to finance their various criminal activities.

13. It was further part of the conspiracy that the defendants ANTHONY ANTONE, VICTOR MANUEL ACOSTA, GEORGE ABRAHAM DE FEIS, JAMES ROSATI, ELLIS MARLOW HASKEW, and others would possess and attempt to sell stolen United States Treasury bills in part to finance their various criminal activities.

*OVERT ACTS*

14. In furtherance of the said conspiracy . . . the following overt acts, among others were committed:

a. In or about June 1975, in Tampa, Florida, FRANK DIECIDUE, MANUEL GISPERT, and ELLIS MARLOW HASKEW did unlawfully, willfully and with premeditation attempt to murder Jose Manuel Garcia utilizing a shotgun.

b. On or about June 14, 1975, FRANK BONI, JR., a/k/a "MUSTACHE FRANKIE", transferred to MANUEL GISPERT and ELLIS MARLOW HASKEW approximately thirty (30) sticks of dynamite together with a quantity of blasting caps near Yeehaw Junction, Florida.

c. On or about June 21, 1975, MANUEL GISPERT and ELLIS MARLOW HASKEW distributed cocaine to FRANK BONI, JR., a/k/a "MUSTACHE FRANKIE", in the Southern District of Florida.

d. On or about June 27, 1975, ANTHONY ANTONE manufactured a destructive device in Tampa, Florida.

e. On or about June 28, 1975, in Tampa, Florida, ANTHONY ANTONE, MANUEL GISPERT, and ELLIS MARLOW HASKEW placed a destructive device on a vehicle operated by Jose Manuel Garcia.

f. On or about June 29, 1975, in Tampa, Florida, the destructive device referred to in Overt Act "e" exploded, injuring Jose Manuel Garcia.

g. In or about July 1975, Jose Manuel Garcia hired MANUEL GISPERT to murder Cesar Rodriguez.

h. On or about July 28, 1975, MANUEL GISPERT received approximately twenty (20) sticks of dynamite from HOMER REX DAVIS in Tampa, Florida.

i. On or about July 29, 1975, ANTHONY ANTONE manufactured and constructed a destructive device in Tampa, Florida.

j. On or about July 30, 1975, MANUEL GISPERT and ELLIS MARLOW HASKEW traveled from Tampa, Florida, to Winter Park, Florida, in an automobile furnished by VICTOR MANUEL ACOSTA, for the purpose of murdering Bernard Dempsey.

Note 1—Continued

k. On or about July 31, 1975, in Tampa, Florida MANUEL GISPERT and ELLIS MARLOW HASKEW placed a destructive device on a vehicle owned by Cesar Rodriguez.

l. On or about July 31, 1975, in Tampa, Florida, the destructive device referred to in Overt Act "k" exploded, injuring Peter Kadyk.

m. In or about August 1975, ELLIS MARLOW HASKEW had a telephone conversation with FRANK DIECIDUE in Tampa, Florida, concerning payment for services rendered in connection with the Jose Manuel Garcia bombing.

n. . . .

o. On or about September 17, 1975, ELLIS MARLOW HASKEW and BENJAMIN FOY GILFORD attempted to murder Cesar Rodriguez with a sawed-off double barrel shotgun which had been furnished by EDWARD STONE.

p. After September 17, 1975, and prior to October 23, 1975, ELLIS MARLOW HASKEW and EDWARD STONE discussed modification of a van from which a high powered rifle could be fired for use in future contract murders.

q. On or about September. 25, 1975, ELLIS MARLOW HASKEW and BENJAMIN FOY GILFORD committed an armed robbery on Beatrice Emery in Tampa, Florida.

r. In or about October 1975, VICTOR MANUEL ACOSTA furnished a silencer and a .32 caliber automatic pistol to ANTHONY ANTONE in Tampa, Florida.

s. On or about October 1, 1975, ELLIS MARLOW HASKEW and BENJAMIN FOY GILFORD committed an armed robbery on A. M. Lee in Lakeland, Florida.

t. On or about October 15, 1975, ELLIS MARLOW HASKEW, BENJAMIN FOY GILFORD, and LARRY NEIL MILLER committed an armed robbery on Marina Fawcett in Zephyrhills, Florida.

u. On or about October 23, 1975, BENJAMIN FOY GILFORD murdered Richard Cloud in Tampa, Florida.

v. . . .

w. . . .

x. In or about November 1975, ELLIS MARLOW HASKEW delivered approximately one kilogram of cocaine to ANTHONY ANTONE in Tampa, Florida.

y. . . .

z. On or about December 20, 1975, LARRY NEIL MILLER passed counterfeit United States currency in Clearwater, Florida.

a.a. . . .

b.b. On or about February 26, 1976, ANTHONY ANTONE possessed approximately eight thousand nine hundred fifty dollars ($8,950) in counterfeit United States currency in Tampa, Florida.

All in violation of Sections 1961 and 1962(d), Title 18, United States Code.

The Grand Jury further charges:

*COUNT TWO*

1. From on or about May 30, 1975, up to and including the date of the filing of this indictment, in the Middle District of Florida and elsewhere,

FRANK DIECIDUE
VICTOR MANUEL ACOSTA
ANTHONY ANTONE
MANUEL GISPERT
ELLIS MARLOW HASKEW
BENJAMIN FOY GILFORD, and
LARRY NEIL MILLER,

the defendants herein, being persons associated with an enterprise as defined by Section 1961(4), Title 18, United States Code, which enterprise was engaged in and the activities of which affected interstate commerce, to wit: a group of individuals associated in fact to engage in various criminal activities including (1) "contract" murders, . . . (2) armed robberies, . . . (3) possessing and dealing in narcotics, . . . (4) possessing and dealing in counterfeit United States currency, . . . (5) possessing and dealing in stolen United States Treasury bills, . . . (6) obstruction of justice, . . . did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activities.

2. The pattern of racketeering activities as defined by Section 1961(1), Title 18, United States Code, engaged in and conducted by the defendants includes the Federal violations charged in Counts Nine, Ten, Eleven and Twelve of this indictment, which are alleged and incorporated in this Count by reference as if fully set forth herein, the State murder offenses chargeable under Sections 782.04 and 777.04, Florida Statutes Annotated, Volume 22, and the State robbery offenses chargeable under Section 812.13, Florida Statutes Annotated, Volume 22, which are described below:

a. Acts of Racketeering Involving Murder:

(1) [same as Count One, overt act a.]

(2) On or about June 29, 1975, in Tampa, Florida, ELLIS MARLOW HASKEW, MANUEL GISPERT, ANTHONY ANTONE, and FRANK DIECIDUE did unlawfully, willfully, and with premeditation attempt to murder Jose Manuel Garcia, a human being, utilizing a destructive device.

(3) On or about July 30, 1975, in Winter Park, Florida, ANTHONY ANTONE, MANUEL GISPERT, and ELLIS MARLOW HASKEW did unlawfully, willfully, and with premeditation attempt to murder Bernard Dempsey, a human being.

(4) On or about July 31, 1975, in Tampa, Florida, ANTHONY ANTONE, MANUEL GISPERT, and ELLIS MARLOW HASKEW did unlawfully, willfully, and with premeditation attempt to murder Cesar Rodriguez, a human being, utilizing a destructive device.

(5) On or about September 17, 1975, in Tampa, Florida, ANTHONY ANTONE, BENJAMIN

Note 1—Continued

FOY GILFORD, and ELLIS MARLOW HAS-KEW did unlawfully, willfully, and with premeditation attempt to murder Cesar Rodriguez, a human being, with a sawed-off double barrel shotgun.

(6) On or about October 23, 1975, in Tampa, Florida, VICTOR MANUEL ACOSTA, ANTHONY ANTONE, BENJAMIN FOY GILFORD, and ELLIS MARLOW HASKEW did unlawfully, knowingly, and with premeditation murder Richard Cloud, a human being.

b. Acts of Racketeering Involving Robbery:

(1) [substantially same as Count One, overt act t.]

All in violation of Sections 1961, 1962(c), 1963, and 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT THREE

On or about June 28, 1975, at Tampa, Florida, in the Middle District of Florida,

FRANK DIECIDUE
ANTHONY ANTONE
MANUEL GISPERT, and
ELLIS MARLOW HASKEW,

the defendants herein, knowingly possessed, and aided and abetted, counseled, commanded, and procured the possession of, a firearm, that is a destructive device which consisted of dynamite, electric blasting caps, a 9-volt battery, and an electrical switch, . . . said possession being a violation of Section 5861(c), Title 26, United States Code, and Section 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT FOUR

On or about June 29, 1975, at Tampa, Florida, in the Middle District of Florida,

FRANK DIECIDUE
ANTHONY ANTONE
MANUEL GISPERT, and
ELLIS MARLOW HASKEW,

defendants herein, aided and abetted by each other, maliciously damaged and destroyed, by means of an explosive, a vehicle . . . used by Jose Manuel Garcia in interstate commerce and in activities affecting interstate commerce, and caused personal injuries to said Jose Manuel Garcia; in violation of Sections 844(i) and 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT FIVE

On or about July 29, 1975, at Tampa, Florida, in the Middle District of Florida,

ANTHONY ANTONE
MANUEL GISPERT
ELLIS MARLOW HASKEW and
HOMER REX DAVIS,

defendants herein, knowingly possessed, and aided and abetted, counseled, commanded, and procured the possession of, a firearm, that is a destructive device which consisted of dynamite, electric blasting caps, a 9-volt battery and an electrical switch, which had been transferred to them in violation of Chapter 53, Title 26, United States Code, in that none of the requirements of Section 5812(a) regarding such transfer had been complied with; said possession being in violation of Section 5861(b), Title 26, United States Code, and Section 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT SIX

On or about July 31, 1975, at Tampa, Florida, in the Middle District of Florida,

ANTHONY ANTONE
MANUEL GISPERT and
ELLIS MARLOW HASKEW,

the defendants herein, knowingly possessed a firearm, that is a destructive device which consisted of dynamite, electric blasting caps, a 9-volt battery, and an electrical switch, . . . said possession being a violation of Section 5861(c), Title 26, United States Code, and Section 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT SEVEN

On or about July 31, 1975, at Tampa, Florida, in the Middle District of Florida,

ANTHONY ANTONE
MANUEL GISPERT and
ELLIS MARLOW HASKEW,

the defendants herein, aided and abetted by each other, maliciously damaged and destroyed, by means of an explosive, a vehicle, . . . used by Cesar Rodriguez in interstate commerce and in activities affecting interstate commerce, and caused personal injuries to Peter Kadyk; in violation of Sections 844(i) and 2, Title 18, United States Code.

The Grand Jury further charges:

COUNT EIGHT

In or about October 1975, at Tampa, Florida, in the Middle District of Florida,

ANTHONY ANTONE
MANUEL GISPERT
ELLIS MARLOW HASKEW
BENJAMIN FOY GILFORD and
LARRY NEIL MILLER,

the defendants herein, knowingly received and possessed, and aided and abetted, counseled, commanded, induced and procured the receipt and possession of a firearm, that is, a silencer for a .32 caliber automatic pistol which had been transferred to said defendants in violation of Chapter 53, Title 26, United States Code, in that none of the requirements of Section 5812(a) regarding such transfer had been complied with; said possession being in violation of Sections 5861(b) and 5861(d), Title 26, United States Code.

The Grand Jury further charges:

COUNT NINE

On or about October 23, 1975, in the Middle District of Florida, VICTOR MANUEL ACOSTA, ANTHONY ANTONE, ELLIS MARLOW HASKEW, and BENJAMIN FOY GILFORD did unlawfully, willfully, and knowingly corruptly endeavor to obstruct and impede the due administration of justice in the United States District Court for the Middle District of Florida; that is, [they] did willfully, knowingly and with

ing a lengthy jury trial, the six defendants were convicted on almost every count in which they had been charged.[2] Having carefully considered the extensive trial record and the many and diverse legal arguments made on appeal, the Court concludes the convictions of defendants Diecidue, Boni and Davis must be reversed and the convictions of Antone, Gispert and Miller must be affirmed.

Each defendant has been separately represented on this appeal and each has filed a separate brief. Each counsel has appropriately sought for his client the advantage of any relevant arguments made by other counsel. Each has also argued issues applicable to his client alone. In this opinion, after briefly stating the facts adduced at trial, we treat several issues which could affect all of the convictions presented for review. We find that none of these arguments merits reversal of any conviction. We then discuss additional issues as they focus on each defendant, affirming and reversing as we proceed.

### Background

Although the facts are treated in greater detail herein in conjunction with discussion of specific issues raised on appeal, an overview of the conspiracy's activities in roughly chronological order will be useful.

The record evidence relevant to the issues on appeal, viewed most favorably to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942),

describes an enterprise whose membership grew as its criminal interests diversified. The enterprise was founded, the Government proposed, by defendant Diecidue who sought protection of his vending machine business through the murder of a new competitor, Manuel Garcia. Diecidue supposedly recruited defendants Antone and Gispert in April or May of 1975 to carry out the crime.

In June Antone brought Marlow Haskew into the enterprise to drive for Gispert while he attempted to shoot Garcia. Gispert obtained the shotgun for the attempt and told Haskew that Diecidue was to pay the three $20,000 for the killing. Twice Haskew and Gispert drove to Garcia's hotel with a loaded shotgun but failed to locate him.

The next attempt on Garcia's life was made with explosives. In May Gispert had met with defendant Miller and Willie Noriega and had purchased a gun from Miller. At that meeting Miller asked Noriega to obtain explosives and suggested he deal with Gispert through Miller so Miller could hike up the price and make some money. Noriega was never able to supply the requested explosives.

During the last week of June Gispert and Haskew drove to a service plaza on the highway from Tampa to Miami where they picked up dynamite from defendant Boni. The dynamite was transported back to An-

---

premeditation murder Richard Cloud, a witness, to prevent said witness from testifying before the United States District Court . . . and to prevent said witness from testifying before a Federal Grand Jury . . . .

All in violation of Sections 1503, and 2, Title 18, United States Code.
The Grand Jury further charges:
*COUNT TEN*
In or about November 1975, at Tampa, Florida, in the Middle District of Florida, ANTHONY ANTONE, the defendant herein, did knowingly and intentionally possess with intent to distribute approximately one kilogram of cocaine, . . . in violation of Section 841(a)(1), Title 21, United States Code.
The Grand Jury further charges:
*COUNT ELEVEN*
On or about December 20, 1975, in Clearwater, Florida, in the Middle District of Florida, the defendant LARRY NEIL MILLER did un-

lawfully and with intent to defraud, pass, utter, and publish a counterfeit obligation of the United States, . . . at Gayfers Department Store, then knowing said obligation to be counterfeit, in violation of Section 472, Title 18, United States Code.
The Grand Jury further charges:
*COUNT TWELVE*
On or about February 26, 1976, at Tampa, Florida, in the Middle District of Florida, the defendant ANTHONY ANTONE did unlawfully, and with intent to defraud, keep in his possession and conceal falsely made, forged, and counterfeited obligations of the United States, . . . and he then knew that such obligations were counterfeit; in violation of Section 472, Title 18, United States Code.
[Portions of the indictment which are not relevant to this decision have been deleted].

2. Defendant Gispert was acquitted on Count Eight.

544

tone's house where Antone constructed a triggering device and showed Gispert and Haskew how to attach the dynamite to it. On June 28 Antone, Gispert and Haskew attached the bomb to Garcia's car. The device exploded, destroying the car and injuring Garcia.

Gispert led Garcia to believe that the attempt on his life had been ordered by Cesar Rodriguez, a Tampa bar owner, and Garcia, in turn, offered $20,000 for Rodriguez' murder. Gispert also obtained murder contracts from codefendant Victor Acosta on the lives of Bernard Dempsey, a former U. S. Attorney, and Richard Cloud, a former Tampa police officer.

In July Gispert and Haskew drove to Miami where they delivered six ounces of cocaine, obtained from Acosta, to Boni. Gispert, Haskew and Antone divided the profits.

Later in July the same trio decided to carry out the Rodriguez murder with explosives. Gispert procured the dynamite through defendant Davis, Antone constructed a triggering device and Gispert and Haskew placed the bomb. When the bomb detonated the car was destroyed and the driver, a family friend, was injured.

Gispert and Haskew made several unsuccessful attempts to locate and kill Dempsey in August and September. Acosta had issued the contract on Dempsey's life because, as a U. S. Attorney, Dempsey had prosecuted several organized crime figures and Acosta owed him over $40,000 in legal fees for work done as a defense attorney after leaving the prosecutor's office.

In September the enterprise gained another member when Haskew assisted Benjamin Gilford to escape from prison. Gilford agreed to serve as triggerman on five murder contracts issued by Acosta. Dempsey, Cloud and Rodriguez were identified as three of the intended victims. Later in September Haskew and Gilford unsuccessfully attempted to murder Rodriguez with a sawed-off shotgun during a car chase through Tampa.

In September and October Haskew and Gilford, joined on one occasion by Miller, committed several robberies. The proceeds were used to finance enterprise activities or support the participants.

The enterprise obtained equipment to carry out the contract murders in September and October. Antone and Haskew purchased a van which was modified into an "assassination" vehicle by cutting shotgun slits in the sides. Antone also gave Haskew a .32 caliber automatic pistol and silencer which he had obtained from Acosta. Gispert had given the weapon to Acosta to procure a silencer. Miller bought the ammunition for the weapon and he and Haskew test-fired it.

Richard Cloud was targeted for murder because, as a Tampa policeman, he had harassed Acosta in his drug business and was expected to testify in October at the trial of a close friend of Acosta's. On October 23 Haskew and Gilford drove to Cloud's home, and while Haskew circled the block, Gilford fatally shot Cloud with the silenced .32 caliber pistol.

After the murder Haskew traveled to Miami where he discussed obtaining counterfeit money with Harvey Davenport and George DeFeis, who were also indicted as coconspirators in the enterprise. In November Haskew made another trip to Miami and stole a kilogram of cocaine, "speed" capsules, a coin collection and jewelry from DeFeis. The cocaine and a diamond ring were turned over to Antone, who sold the cocaine to Acosta. Another ring, the coins and speed were given to Miller.

In December Haskew purchased from Davenport $40,000 in counterfeit bills, some of which Haskew passed in Florida, New Jersey and Pennsylvania. Miller attempted to sell some of the bills and used a counterfeit hundred dollar bill to purchase cologne in a Clearwater department store.

In January 1976 Miller, according to Haskew's testimony, asked Haskew to get him a weapon with a silencer so that he and Scarface Rivera could make a hit on a man living in a trailer who intended to testify against them. Haskew was never able to supply the weapon.

In February Gilford attempted to recruit another participant to complete remaining murder contracts and was subsequently arrested. Haskew was arrested shortly thereafter. Both confessed, setting forth the details of the conspiracy.

*Sufficiency of Indictment*

Defendants raise several objections to Count One of the indictment in which a RICO conspiracy is charged. Section 1962(d) of the Act makes unlawful a conspiracy to violate § 1962(c) which in turn provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c).

Despite defendants' arguments reflecting a tireless search for ambiguity and omission in the indictment, we are convinced that Count One adequately alleged all essential elements of a § 1962(d) offense and fairly informed defendants of the charges against them.

Defendants contend first that the enterprise whose affairs they allegedly conspired to conduct was not one within the scope of the Act. The enterprise, they assert, must be an identifiable group with finite goals and an existence separable from the pattern of racketeering activity to which some or all of its members ultimately resort. "[A] bunch of crooks," defendants argue, "who decide to do whatever comes along, criminal or otherwise, in order to make a 'buck,' is . . . utterly removed from anything Congress had in mind."

Defendants fail to recognize the breadth of the Act's definition of "enterprise" and its expansive interpretation and application by this Court. "Enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). This Court has already rejected the contention that § 1961(4) does not encompass groups whose only purpose is to engage in illegal behavior. *See, e. g., United States v. Elliott,* 571 F.2d 880, 897 n.17 (5th Cir. 1978), *cert. denied,* 489 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1979). Furthermore, nothing in the Act or in the opinions by which this Court has interpreted it suggests that the enterprise must have been functioning and conducting operations in pursuit of a common goal prior to its involvement in racketeering activities. Similar objections were recently raised in *United States v. Elliott, supra,* in which six defendants were charged in essence with conspiring to conduct the affairs of an enterprise designed to commit thefts, fence stolen property, traffic in drugs and obstruct justice. The Court concluded that such an informal and loosely connected "myriopod criminal network" was indeed within the scope of the Act. 571 F.2d at 899. *See also United States v. Malatesta,* 583 F.2d 748 (5th Cir. 1978), *aff'd en banc,* 590 F.2d 1379 (1979) (conspiracy to operate an illegal scheme to obtain money, marijuana and cocaine through extortion, kidnappings and robberies); *United States v. McLaurin,* 557 F.2d 1064 (5th Cir. 1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978) (conspiracy to conduct affairs of prostitution ring through several acts of prohibited interstate travel); *United States v. Morris,* 532 F.2d 436, 442 (5th Cir. 1976) (indictment alleged sufficient enterprise by describing defendants " 'a group . . . associated in fact to defraud in illegal card games persons who had travelled to . . . Nevada.' ").

We conclude that Count One of the indictment properly charged a conspiracy to conduct the affairs of a § 1961(4) enterprise through racketeering activities, the nature of which was precisely stated, and adequately informed defendants that the enterprise whose affairs they conspired to conduct was one which they, by their association, had formed. *See United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976).

That the formation of the enterprise and the conception of the conspiracy may have occurred simultaneously in no way detracts from the Act's applicability.

Defendants further allege that Count One is duplicitous by charging more than one conspiracy. Although defendants claim to find in the allegations of Count One separate conspiracies to form an enterprise and conduct its affairs through a pattern of racketeering activity, to join an existing enterprise, to engage in the purchase and sale of cocaine, to possess and distribute counterfeit currency and to possess and attempt to sell stolen U. S. Treasury bills, Count One reasonably describes only one conspiracy, the conspiracy announced in paragraph one to violate 18 U.S.C.A. § 1962(c). Section 1962(c) prohibits neither the forming of an enterprise nor the joining of one. Neither does it reach isolated criminal acts such as drug sales or possession of stolen or counterfeit money. Conspiracy to violate § 1962(c) can be only conspiracy to conduct and participate in the conduct of an enterprise's affairs through a pattern of racketeering activities. The allegations addressed to the various substantive offenses committed as part of the conspiracy are merely descriptive of the single overall agreement and do not render the count duplicitous. *See Braverman v. United States,* 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

Defendants also attack Count One for failure adequately to allege knowledge, a material element in the crime charged. *See United States v. Malatesta,* 583 F.2d at 759–60. They suggest the indictment should have alleged conspiracy to perform § 1962(c) offenses "knowing of the enterprise" and commission of each of the recited offenses which describe the pattern of racketeering activity "with knowledge that the conduct was intended to be part of a pattern of racketeering." Paragraph one of the count alleges defendants "willfully and knowingly" conspired to violate § 1962(c).

Each of the substantive offenses was introduced as "a further part of the conspiracy" and most appeared again in Count One's catalogue of thirty overt acts alleged to have been committed "in furtherance of the said conspiracy and to effect the objects thereof." Taken as a whole, the allegations of Count One sufficiently charge defendants with specific intent to commit the described offense. In *United States v. Purvis,* 580 F.2d 853, 859 (5th Cir. 1978), *cert. denied,* 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979), this Court observed:

> "Conspiracy" incorporates willfulness and specific intent. As the Supreme Court stated in *Frohwerk v. United States* [249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561], "intent to accomplish an object cannot be alleged more clearly than by stating that parties conspired to accomplish it." [citation omitted].

Defendants assert that the indictment failed to charge offenses under 18 U.S.C.A. § 1962 because an essential element of the offenses, effect of the enterprise's activities on interstate commerce, was not alleged with sufficient specificity.[3]

▮ Rule 7, Federal Rules of Criminal Procedure, states: "The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The indictment must inform defendants of the nature and cause of the accusation to permit preparation of a defense and must equip defendants with sufficient facts to plead former jeopardy in a subsequent prosecution for the same offense. 8 Moore's Federal Practice ¶ 7.04 at 7–15 (rev. 2d ed. 1978); *United States v. Contris,* 592 F.2d 893 (5th Cir. 1979). An indictment which specifically states all elements of the offense also ensures that the grand jury charged such an offense and that critical parts of the charged offense were not subsequently contributed by the prosecutor alone. *See Van Liew v. United*

---

**3.** This issue is raised in connection with Count One of the indictment by defendant Boni who was charged only in that count. However, because defendants have adopted all relevant arguments of codefendants' briefs, we consider the issue as it applies to Count Two, the substantive RICO violation, as well.

*States*, 321 F.2d 664 (5th Cir. 1963); *United States v. Nance*, 174 U.S.App.D.C. 472, 533 F.2d 699 (D.C.Cir. 1976).

Defendants do not contend that insufficient proof of effect on interstate commerce was adduced at trial. The Government's case suggested interstate commerce was affected by the use of interstate communications facilities to make long distance phone calls, destruction of one or more automobiles used in activities affecting interstate commerce, receipt of dynamite in Florida manufactured outside the state, and possession of cocaine, a federally controlled substance. Defendants complain, rather, that effect on interstate commerce was alleged in conclusory terms, the generality of which gave the Government unfettered discretion in choosing facts with which to prove it at trial.

Clearly the indictment does not subject defendants to the danger of being retried for the same participation with the same enterprise on merely a different theory of effect on interstate commerce. Nor can we conclude that defendants were hampered in the preparation of their defenses or that the grand jury might not have charged the offenses of which defendants were convicted.

█ The indictment charged interstate commerce effect in the RICO conspiracy and substantive offenses in the language of the statute itself, a practice which generally guarantees sufficiency if all required elements are included in the statutory language. *United States v. Davis*, 592 F.2d 1325, 1328 (5th Cir. 1979). Where the statutory definition contains generic terms, however, the indictment may not simply recite the generic terms but "must state the species,—it must descend to particulars." *United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

In *United States v. Nance, supra*, for example, convictions on false pretenses counts were vacated because the indictment failed to set forth any of the false representations made. The court observed, "the United States Attorney would have a free hand to insert the vital part of the indict-ment without reference to the grand jury." 174 U.S.App.D.C. at 474, 533 F.2d at 701. Similarly, in *United States v. Farinas*, 299 F.Supp. 852, 854 (S.D.N.Y.1969), the court dismissed an indictment which charged a violation of the Selective Service Act of 1967 in defendant's refusal "to obey certain orders" but failed to specify the nature of the orders disobeyed.

The nature of the omissions in these cases persuades us that this indictment need not fall under the same theory. The distinction is that between a defendant's constitutional right to know *what* offense he is charged with and his need to know the evidentiary details which will be used to establish his commission of that offense. *See Van Liew v. United States*, 321 F.2d at 670; *Carbo v. United States*, 314 F.2d 718, 732–33 (9th Cir. 1963) (where indictment charges Hobbs Act conspiracies to commit extortion and to transmit threats by interstate communications, manner in which interstate commerce to be affected need not be alleged).

In this indictment, an explicit discussion of the enterprise's effect on interstate commerce would contribute virtually nothing to defendants' understanding of the nature of the offenses charged which were conducting an enterprise's affairs through racketeering activity and conspiracy to do the same. This is not a case where the element alleged in nonspecific terms, effect on interstate commerce, might encompass conduct which would not come within the statute's reach. *See, e. g., United States v. Farinas*, 299 F.Supp. at 854. Neither are we faced with a variance between allegations of interstate commerce effect in the indictment and proof at trial through which defendants might have been convicted on some other charge than that made in the indictment. *See United States v. Malatesta*, 583 F.2d at 754–56 (where RICO indictment charged interstate commerce aspects in general terms, proof of acts of kind described, though acts not specifically mentioned in indictment, is permissible absent demonstration of possible prejudice).

We find no indication in the record or in the argument made on appeal that defend-

ants were surprised or in any way prejudiced by the generality of the interstate commerce allegation or evidence subsequently introduced to establish it. The indictment was, therefore, sufficient.

## Jury Instructions

■ Defendants raise objections to the trial judge's instructions to the jury on the issues of knowledge and intent required for conspiracy conviction and multiple or single conspiracies. Because the jury charge, considered as a whole, clearly conveyed the legal principles by which the jury should have made its decision, we find defendants' objections to be without merit. *United States v. Fontenot,* 483 F.2d 315, 322 (5th Cir. 1973).

Regarding conspirators' knowledge and intent, the trial judge instructed the jury as follows:

> One may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So, if a defendant, with an understanding of the unlawful character of a plan, knowingly and willfully joins in an unlawful scheme on one occasion, that is sufficient to convict him for conspiracy even though he had not participated at earlier stages in the scheme and even though he played only a minor part in the conspiracy.

> Of course, mere presence at the scene of an alleged transaction or event, or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator.

The judge subsequently defined "knowingly" and "willfully" as follows:

> The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

> The word "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposedly, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

Considering these instructions together, *United States v. Evans,* 572 F.2d 455, 471 n. 15 (5th Cir. 1978), we find they present an accurate statement of the law and do not differ materially from the charge requested by the complaining defendant or that approved in *United States v. Fontenot,* 483 F.2d at 323–24. *Cf. Rubin v. United States,* 414 F.2d 473, 475 (5th Cir. 1969), *cert. denied,* 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970) (where "willfully" and "knowingly" defined to the jury, implicit in verdict was finding defendant had necessary criminal intent for conviction).

Defendants also assert error in the trial judge's refusal to instruct:

> Count 1 of the indictment charges defendants' participation in one conspiracy. Should you find that the evidence shows the existence of a number of conspiracies, then you must find the defendants not guilty as to Count 1.

The requested instruction is incorrect because one of the conspiracies found to exist might well be the single conspiracy charged, *United States v. Taylor,* 562 F.2d 1345, 1351 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Tramunti,* 513 F.2d 1087, 1107–08 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), or the jury could find several different conspiratorial agreements that were steps in the formation of a larger, overall conspiracy. *United States v. Perry,* 550 F.2d 524, 532–33 (9th Cir.), *cert. denied,* 431 U.S. 918, 98 S.Ct. 104, 53 L.Ed.2d 228 (1977).

The following instruction on single and multiple conspiracies was given in its place:

You are further instructed, with regard to the conspiracy offense alleged in Count 1, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to Count 1. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

Contrary to defendants' assertions, this instruction neither "directs a verdict" on the existence of a single conspiracy nor permits the jury to find defendants guilty as long as each belongs to any single conspiracy whose existence was suggested by the proof and fit the various allegations within Count One. The instruction, identical to that approved in *United States v. Tramunti,* 513 F.2d at 1107, clearly requires the jury to find that the single overall conspiracy alleged in Count One exists and that each particular defendant is a member of that conspiracy.

### Motions for Mistrial When Defendants Seen Shackled

■ Defendants contend that the trial court erred in denying motions for mistrial when some of them were seen in shackles by jurors or prospective jurors. Because defendants have failed to show prejudice from such exposure, we find their contention to be without merit.

The first motion for mistrial was made during jury selection after it was called to the court's attention that the jury venire was observing defendants enter the courtroom flanked by United States Marshals. The court observed that potential prejudice had been avoided by defendants appearing in business suits and ties and by nonuniformed marshals without their badges and the motion was denied.

A second motion was made when, during jury selection, at least one juror was identified in a group of people who observed defendants being brought into the courthouse in handcuffs. The motion was denied. Defendants sought no cautionary instruction, nor was interrogation of the identified juror requested.

During the early days of the trial itself, a third motion was filed after a juror observed several defendants being led from the courthouse in waist chains and handcuffs. Defendant alternatively sought to have that juror struck. The juror, questioned by the court at defendants' request, replied that her impartiality would not be influenced by the incident and that she had not discussed and would not discuss it with other jurors. Mistrial was denied. Again no instruction was sought that handcuffs are not indicia of guilt.

■ Defendants accused of crimes are, of course, entitled to physical indicia of innocence in their jury trials. This Court has declared, however, that brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice. *Wright v. State of Texas,* 533 F.2d 185, 187 (5th Cir. 1976).

The conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial. *See United States v. Theriault,* 531 F.2d 281, 284 (5th Cir.), *cert. denied,* 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976). Defendants have made no showing of actual prejudice, nor will we assume any from the circumstances surrounding the two isolated incidents. *See Dupont v. Hall,* 555

F.2d 15, 17 (1st Cir. 1977). Defendants failed to request examination of jurors in order to determine who had seen defendants in shackles or to exclude those whose impartiality might be affected. *See Wright v. State of Texas*, 533 F.2d at 187; *United States v. Taylor*, 562 F.2d at 1359. Neither was any request made for a cautionary instruction. The trial court was clearly not in error in denying the motions for mistrial.

### Exclusion of Evidence As to Principal Witness

Defendants Miller and Gispert sought to attack Haskew's credibility at trial by showing he was biased against them because they had repelled his homosexual advances. They complain on appeal that they were prevented from introducing evidence demonstrating that bias.

Regarding Haskew's sexual predilections, defendants were permitted to ask on cross-examination whether Haskew was a homosexual and whether he had made sexual advances to Gispert, Miller and Miller's wife. Haskew's responses were negative. Miller's wife was then permitted to testify that Haskew had made advances to Miller in her presence which Miller had repulsed. The court, however, refused the testimony of two witnesses who would have testified that Haskew engaged in homosexual activities. The court also sustained an objection made when Mrs. Miller testified that Haskew had made overt sexual advances to her. Miller's counsel advised the court that her anticipated testimony to the effect that she had repulsed those advances saying "Marlow, you know you are not interested in me, you are interested in Larry," would have further showed Haskew's bias.

■ Extrinsic evidence of specific instances of a witness' conduct is generally not admissible to contradict his testimony on matters collateral to the issues in the case and so attack his credibility. *See* Federal Rules of Evidence 608(b); McCormick, Evidence, § 47 at 98 (2d ed. 1972). The bias of a witness, however, is not a collateral matter and the party examining the witness is not bound by his denial of acts

tending to show his bias. 3A Wigmore, Evidence, § 948 at 783 (Chadbourn rev.); *United States v. Robinson*, 174 U.S.App. D.C. 224, 227, 530 F.2d 1076, 1079 (D.C.Cir. 1976); *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir. 1976).

■ The extent of proof of bias is a matter reserved to the discretion of the trial judge and the judgment will be disturbed on review only where an abuse of that discretion is shown. *See United States v. McCann*, 465 F.2d 147, 163 (5th Cir. 1972), cert. denied, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973); *Tinker v. United States*, 135 U.S.App.D.C. 125, 127, 417 F.2d 542, 544 (D.C.Cir.), *cert. denied*, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969). In considering evidence proffered to show bias, the judge must determine whether it is probative of bias and, if so, whether its probative value outweighs the risks of prejudice attending its admission. *See Howell v. American Live Stock Insurance Co.*, 483 F.2d 1354, 1357 (5th Cir. 1973); *United States v. Robinson*, 530 F.2d at 1080.

The probative value of the evidence offered here is very slight. The inference of Haskew's bias against defendants rests on the belief that defendants were indeed subjected to and rejected Haskew's advances. Mrs. Miller was permitted to testify that her husband had rejected such advances, and her further testimony would have been probative of Haskew's animus toward her rather than defendant Miller. Although Gispert suggested that he would introduce evidence of Haskew's advances to him, none was introduced. Evidence that Haskew engaged in homosexual activity with other persons provides little support for a conclusion that he made similar overtures to either defendant. *See Howell v. American Live Stock Insurance Co.*, 483 F.2d at 1357–58; *United States v. Nuccio*, 373 F.2d 168, 171 (2d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967). Furthermore Haskew's bias against Gispert had already been suggested in his own testimony wherein he recalled telling Antone that Gispert would not get him because he carried a gun at all times and kept his eye on "the snake" whenever he saw him.

Defendant Gispert also complains that the two witnesses whose testimony was excluded would have told of using marijuana and cocaine with Haskew. Evidence of Haskew's drug use during the time of the events in question, Gispert submits, is relevant to Haskew's credibility. *See* McCormick, Evidence, § 45 at 94.

When Gispert asked Haskew on cross-examination whether he used drugs during the conspiracy, Haskew replied, "I have used narcotics, yes." Haskew admitted he took a gram of cocaine a week and smoked "some joints of pot." While Haskew's responses are somewhat vague as to the time of his drug use, Haskew later testified to having used cocaine the night before transferring cocaine to Boni in Miami in July 1975 and at the time he stole cocaine from George DeFeis in Miami in September. The trial judge correctly observed that the witnesses' testimony on drug use would be redundant. Again, evidentiary questions are committed to the broad discretion of the trial judge, *United States v. McCoy*, 515 F.2d 962, 964 (5th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 795, 46 L.Ed.2d 649 (1976), and we cannot say that discretion was abused here.

### Exclusion of Evidence as to Other Government Witness

Defendants argue that the trial court erred in refusing to admit into evidence the psychiatric records of the Government witness, Willie Noriega. The records of Noriega's confinement in a mental hospital, they assert, reflect on his ability to know, remember and accurately relate the events about which he testified. Defendants cite as authority *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974), which states:

> [T]he jury should . . . be informed of all matters affecting a witness's credibility to aid in their determination of the truth. It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. [citation omitted].

The court in *Partin* held it to have been reversible error to exclude hospital records showing that a few months before the crime about which he testified the witness had voluntarily committed himself to a hospital with auditory hallucinations and occasional confusion of his own identity.

*Partin*, however, limited admissible evidence of mental incapacity to that which was "probatively related to the time period about which he was attempting to testify." 493 F.2d at 763. Here the events about which Noriega testified occurred twelve years after his treatment. In response to questions about his commitment, Noriega testified that he was committed in 1963 by order of the court declaring him mentally incompetent, was treated for four months and since his release was never again treated for any type of mental illness.

Because Noriega's psychiatric records were not probatively related to the events in 1975 and 1976 about which Noriega testified, the trial judge committed no abuse of discretion in refusing them.

### Refusal to Strike Witness Testimony

Defendants assert that Willie Noriega's refusal to answer questions during cross-examination by invoking his Fifth Amendment privilege deprived defendants of their Sixth Amendment right to confront witnesses through full cross-examination. The court therefore erred, they contend, in refusing to strike Noriega's direct testimony on subjects regarding which the Fifth Amendment privilege was asserted.

Noriega refused to answer the following questions on Fifth Amendment grounds: whether his January 1976 conference with Government agents was "primarily because of his own personal activities in criminal affairs"; whether since 1974 he had had a source of income other than employment or had filed a tax return; whether he had ever testified falsely under oath or so testified in a case in which he was charged with a felony; and whether he was nicknamed "Smokey the Bear." On

each occasion, the trial court sustained Noriega's assertion of the privilege. Defendants especially challenge those rulings only with regard to the perjury inquiries. Contrary to defendants' suggestion, however, Noriega's admission to a Government agent prior to trial that he had previously committed perjury did not waive his privilege to invoke the Fifth Amendment as to that matter in this trial. *See Ballantyne v. United States*, 237 F.2d 657, 665 (5th Cir. 1956).

■ Where a witness has legitimately invoked the privilege, his direct testimony must be struck only if the defendants' inability to complete their inquiry created a "substantial danger of prejudice by depriving [them] of the ability to test the truth of the witness's direct testimony." *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir.), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). It is generally only where the witness refuses to answer on "direct" as opposed to "collateral" matters that his direct testimony must be excised. *Id.*

Defendants were not hampered in testing the truth of Noriega's direct testimony by his silence in response to any of these questions. The apparent objective of defendants' inquiries was the undermining of Noriega's credibility. Noriega's lack of credibility was clearly the dominant theme of his cross-examination. Because Noriega admitted to having lied in the past during extended cross-examination on his veracity, was thoroughly cross-examined on his cooperation with law enforcement agents, and testified on cross-examination that at the time the police first approached him he was charged with armed robbery and at the time of trial was scheduled to be tried on a state arson charge, the responses elicited by defendants' questions would have been mere cumulative evidence of credibility. *See United States v. Newman*, 490 F.2d 139, 145 (3d Cir. 1974); *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

■ The argued relevance of the precluded responses to matters directly in issue in the case rests on a chain of inferences too long and tenuous to support defendants' assertion that for lack of them defendants could not test the truth of Noriega's direct testimony. We detect no abuse of discretion in the trial court's ruling.

### Prosecutor's Closing Argument

Defendants challenge a number of alleged improprieties in the closing summations to the jury. The contested remarks merit neither reversal nor protracted discussion.

■ Defendants argue that the Government's rebuttal, using phrases such as "the attorney for Mr. Miller talked to you about" and "Mr. Gispert through his attorney recited," constitutes improper comment on defendants' failure to testify. The test for impermissible comment has been enunciated by this Court as whether "it can be said that the prosecutor's manifest intention was to comment upon the accused's failure to testify [or] was . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Samuels v. United States*, 398 F.2d 964, 968 (5th Cir. 1968), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Considering that the use of these phrases occurred during rebuttal and in response to particular arguments made in closing by defense counsel, it is at least equally plausible that the Government intended to address those arguments rather than emphasize that defendants, by failing to testify, were heard only through their attorneys. *See United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977). Furthermore the jury would reasonably construe the use of such phrases as directing their attention to specific arguments made by defense attorneys in closing. Finally we note that the court instructed the jury subsequently that no inference may be drawn from a defendant's election not to testify.

■ We also reject the suggestion that defendants' silence was unfairly accentuat-

ed by the closing comments of counsel for codefendant Stone, the only defendant who testified at trial. While adverse references to an accused's silence by counsel for a testifying codefendant have been regarded as reversible error, *DeLuna v. United States*, 308 F.2d 140, 154 (5th Cir. 1962), mere favorable observation on the willingness of one of several codefendants to testify has not. *See United States v. Washington*, 550 F.2d 320, 328 (5th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 116, 54 L.Ed.2d 92 (1977); *United States v. Hodges*, 502 F.2d 586, 587 (5th Cir. 1974). Defendant Stone's attorney made no reference to the silence of other defendants but merely observed that Stone had told his story under oath, subject to cross-examination and before the scrutiny of the jury.

Finally defendants argue they were unfairly characterized as cowards in the Government's rebuttal argument. The Government remarked that the modus operandi of the conspirators was to get someone else to do their dirty work and thus "cover themselves" and that the cowardice of the conspirators was demonstrated by the surreptitious nature of their crimes.

 We do not find in these remarks the "type of shorthand characterization of an accused, not based on evidence, [which] is especially likely to stick in the minds of the jury and influence its deliberations." *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969) (prosecutor referred to defendant as "hoodlum"). Moreover the characterization of "coward" does not have the specific legal connotation of a description like "fugitive" and carries no risk of being misconstrued as a legal conclusion. *See United States v. Goodwin*, 492 F.2d 1141, 1147 (5th Cir. 1974). Here the thrust of the prosecutor's remarks was the secrecy with which the criminal affairs of the enterprise were conducted and the concomitant lack of direct evidence of any defendant's association with the enterprise. Unflattering characterizations of defendants are not reversible error when supported by the evidence. *United States v. Windom*, 510 F.2d 989, 994 (5th Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct.

121, 46 L.Ed.2d 91 (1975) ("con artist"); *Walker v. Beto*, 437 F.2d 1018, 1020 (5th Cir. 1971) ("professional criminal"). The characterization of a murder and murder attempts perpetrated by ambush and booby traps as "cowardly" is neither unfounded nor unfairly prejudicial.

## FRANK DIECIDUE

Frank Diecidue was convicted on all four counts under which he was charged: the conspiracy and racketeering counts, one count concerning firearms, and one count concerning the destruction of an automobile. He was sentenced to concurrent terms of twenty years on the first two counts and consecutive terms of ten and twenty years on the other two counts.

 In addition to adopting all relevant arguments of the other defendants in this case, Diecidue argues that the trial court erred in admitting against him hearsay evidence of alleged coconspirators when there was insufficient evidence to show that he was a member of the conspiracy. A review of the record establishes the validity of this argument. Without this hearsay evidence there is insufficient evidence to establish beyond a reasonable doubt that defendant was guilty of either the conspiracy charged in the indictment or that he was a member of the enterprise charged. Thus his convictions on these two counts must be reversed. The admission of inadmissible evidence tainted his conviction on the other two counts so that they must be reversed and the case remanded for a new trial. In view of this disposition of the case, it is unnecessary to rule on Diecidue's second major argument, that the district court erred in denying his motion for severance.

The only evidence which clearly linked defendant Diecidue with specific activities of the conspiracy was presented in the testimony of the Government's chief witness, Marlow Haskew. Haskew testified that he engaged in the following dialogue with coconspirator Gispert en route to Yeehaw Junction where they picked up dynamite to be used in a car bombing:

He asked me if I had any qualms about placing a bomb on a car, and I told him that I never had. . . . And I said, "Well I don't care, you know, as long as we're going to get paid. Do you know who we're dealing with . . .? And he said, "Yes." He said, "We're doing this for Frank Diecidue."

Haskew also testified to having had the following conversation with coconspirator Antone the following day:

I . . . told him what Gispert had said to me on the way to Yeehaw Junction, and he said, "yes." He says, "Don't worry about the money." He says, "I know Diecidue well."

Although this Court revised the conditions for admission of coconspirator hearsay in its recent en banc decision, *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), *James* applies only to statements introduced in trials commencing after thirty days from the date of that opinion. Therefore defendant's appeal must be considered under the standards set forth in *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973). The *Apollo* test was articulated in *United States v. Oliva*, 497 F.2d 130, 132–33 (5th Cir. 1974), as

whether the government, by evidence independent of the hearsay declarations of the co-conspirator, has established a prima facie case of the existence of a conspiracy and of the defendant's participation therein, that is whether the other evidence *aliunde* the hearsay would be sufficient to support a finding by the jury that the defendant was himself a conspirator.

The Government argues that Diecidue's role as a knowing conspirator is demonstrated by the independent evidence presented by three witnesses, Willie Noriega, Cesar Rodriguez and Marlow Haskew. Noriega testified to having had three discussions with Diecidue in late April 1975. In the first, Diecidue asked Noriega if he knew how to use dynamite and if he would mind showing someone else how to use it.

They planned to meet again the following day at Diecidue's place of business, Dixie Amusement. At that time Diecidue, fearful that his office was bugged, asked Noriega to step out back and asked Noriega to go with someone to try out bundles of five sticks of dynamite on tree stumps in the country. Several days later Noriega returned to Dixie Amusement where Diecidue told him he had found someone else to take care of that and his services would not be needed.

The Government argues the significance of these meetings in light of evidence adduced to show that two months later dynamite was used to blow up the car of Manuel Garcia who had become Diecidue's competitor in the vending machine business sometime in April. The tree stump Diecidue had in mind, the Government argues, was in fact the artificial leg of Garcia.

Noriega also testified to having seen Diecidue conversing with defendant Gispert at a party at the Castaways Lounge in June 1975. The Government notes that Gispert was one of the participants in the Garcia bombing.

Considering the events of the conspiracy chronologically, the next evidence of Diecidue's involvement came in the testimony of Cesar Rodriguez whose car was bombed on July 31, 1975. Several days after the bombing, Diecidue phoned Rodriguez at one of Rodriguez' lounges and said, "Cesar, this is Frank Diecidue. What the hell's going on? I don't understand these bombings. Not you. I can see Manuel. He's got a lot of enemies." Rodriguez replied, "I don't know what's going on, Frank. Thank you for calling. I don't want to discuss it on the phone." This phone call, the Government suggests, was Diecidue's attempt "to cover his tracks."

Noriega testified that in August 1975, Diecidue asked him if he had had anything to do with the bombing of a building in which Diecidue had installed vending machines and if he was working for Rodriguez or Garcia. The Government construes these questions as evidence that Diecidue was concerned that his own involvement was

suspected and that he was being bombed in retaliation.

Haskew testified to several telephone calls he made to Diecidue in August and September 1975. In the first Haskew said:

Well, you little drunk, you got us all in hot water behind these bombings, but that's all right. You're going to get yours. We've been watching you so long, that little white dog out behind your house loves us more than he does you.

Diecidue responded in a highly excited manner "Who is this talking this way on my phone?" and started cursing, whereupon Haskew hung up. In the second call Haskew said simply "we're still watching," to which Diecidue responded in a manner construed by Haskew as a threat, "I told you don't call on my phone that way. I'll meet you anywhere. You name the time and place." Diecidue began cursing and Haskew hung up. Haskew called Diecidue a third time, leaving a message for him at Dixie Amusement that "we're still watching him." The Government argues that Diecidue's failure to deny involvement in response to Haskew's accusatory remarks indicates his complicity.

Finally, Noriega told Diecidue shortly before his indictment that Diecidue was going to jail on these bombings and there was a lot of talk in town. Diecidue got upset, told Noriega it was none of his business and left. The Government again attributes significance to his failure to deny involvement.

The Government's case against Diecidue, absent the statements of Antone and Gispert, is built of supposition on a foundation of inference. There is not the slightest evidence to connect Diecidue's interest in dynamite in April with the dynamite used in the Garcia and Rodriguez bombings or with the perpetrators of those acts. Noriega testified he had no idea what Diecidue and Gispert were discussing at the June 1975 party, and conspiratorial participation is clearly not evidenced by mere association with a conspiracy's members. No evidence suggested that Rodriguez was a competitor or enemy of Diecidue, and Rodriguez testified that Diecidue had never attempted to coerce him to place Dixie Amusement vending machines in his lounges. Diecidue's responses to Haskew's threatening phone calls were no more suspicious a response than would have been denying involvement to a complete stranger who purported to have him under constant observation. Nor should Diecidue be penalized for failing to defend his innocence to Willie Noriega.

We conclude that whatever misdeeds the evidence against Diecidue may suggest, it fails to establish Diecidue's participation in the conspiracy. "Leaving the hearsay testimony out of consideration destroys the case in fact. Taking it into consideration destroys it in law." *Panci v. United States*, 256 F.2d 308, 311 (5th Cir. 1958).

## FRANK BONI, JR.

The evidence showed that there was a criminal conspiracy among Miller, Gispert, Antone and others in connection with the criminal enterprises prohibitions of RICO. The only count against Boni charged him with being a part of that conspiracy, for which he was sentenced to twenty years imprisonment. The only evidence against him consisted of his supplying dynamite to certain members of the conspiracy and purchasing cocaine from another member.

The Government's brief recites the facts against Boni. In early June 1975 appellant Boni told Nathan Brooks Wood that he was interested in purchasing explosives from Wood for $500. Several days later, Boni telephone Wood and advised that his "people were ready" for the "merchandise" (a term Boni and Wood used to mean dynamite for fear their conversations were being monitored). Accordingly, Wood met Boni at a coffee shop in Miami, where Boni gave him $500 and advised that he would get in touch with Wood within the next few days if he needed more dynamite. In order to effect the transfer of dynamite, Boni told Wood to follow him a few blocks "to make sure [they] weren't followed." When the dynamite (packaged in plastic containers inside a suitcase) had been placed in the trunk of Boni's car, Wood handed Boni the blasting caps and attempted to explain how to

detonate the dynamite. Boni said that was unnecessary because "the people he was taking it to knew how to handle it."

During the last week of June 1975, Boni met Gispert and Haskew at a service plaza on the highway between Miami and Tampa. At that time Boni transferred to them a suitcase filled with plastic containers of dynamite and the blasting caps. Gispert told Haskew he paid Boni $1,250 for the dynamite.

When Gispert and Haskew returned to Tampa, Antone expressed disappointment that they had not obtained plastic explosives which were "easier to handle." Several days after the dynamite was used to bomb Manuel Garcia's car, Boni contacted Wood and told him that his "people were well pleased with the merchandise." Boni said that he was interested in obtaining some "stronger stuff . . . or some type of plastic explosive that would be easier to handle." Wood agreed to check into the possibility, but subsequently reported to Boni that "they'd increased the security around the place and [Wood] wasn't able to get it." Boni contacted Wood concerning explosives on at least six subsequent occasions, but Wood was never able to procure more. In July 1975 Gispert told Haskew that he thought he could get dynamite for the Rodriguez bombing from a junk yard dealer (defendant Davis) because Boni was unable to supply any more.

In July 1975 Gispert and Haskew delivered to Boni six ounces of cocaine that Gispert had obtained from Acosta. The money from that transaction was divided equally among Gispert, Antone and Haskew, the core members of the enterprise.

The Government contends that this evidence was sufficient to warrant the inference that Boni supplied dynamite to the enterprise on one occasion and unsuccessfully attempted to obtain explosives on another. It argues that the secretive manner in which Boni took possession of the material from Wood and his desire to obtain "stronger stuff" justify the inference that he knew the purpose for which Gispert and Haskew wanted the dynamite. That involvement, the Government asserts, and his purchase of a substantial amount of cocaine from the enterprise established beyond a reasonable doubt that Boni had knowledge of the ongoing, diverse nature of the operation and that he agreed to participate in the affairs of the enterprise.

The Government's argument seems to overlook the unique characteristics of a RICO enterprise. There can be little doubt that the evidence showed Boni to be guilty of substantive crimes. The evidence may even show his guilt of conspiracy to commit certain substantive crimes. Whether he has been or will be charged with those crimes is not within the scope of this record and can be of no concern to the Court on this appeal. The question is whether he is guilty of the crime charged.

■ The Government has contended and we have held that the indictment charged a conspiracy to conduct a criminal enterprise as defined in 18 U.S.C.A. § 1961(4) through a pattern of racketeering activity which, in turn, is defined to require two or more acts of racketeering. 18 U.S.C.A. § 1961(5). The transfer of the dynamite is not such a statutorily defined act. Contract murders would be. Sale of cocaine would be. Dealing in narcotics would be. Boni's purchase of cocaine from the enterprisers would not be an agreement with them to conduct the enterprise, although it would go to his knowledge as to the enterprise's activities. There is no evidence upon which to find that Boni knew the enterprisers were engaged in contract murders, a proven purpose of the enterprise, or that dealing in drugs was a part of that enterprise activity. It is not even contended that Boni had any knowledge about the armed robberies, distribution of counterfeit currency, or stolen Treasury bills. Without evidence that Boni knew something about his codefendants' related activities which made the enterprise, he could not be convicted of conspiring to engage in a pattern of racketeering as defined by the statute. His conviction for the crime charged must be reversed.

## HOMER REX DAVIS

Homer Rex Davis was convicted on two counts: the main conspiracy count and one count involving a destructive device. He was sentenced to consecutive terms of ten years on the first count and five years on the second count.

■ The Government concedes the evidence of defendant Davis' involvement in the affairs of the enterprise is insufficient to sustain his conviction of conspiracy. Even if the evidence showed that Davis supplied the dynamite used in the Rodriguez car bomb and permitted the inference that Davis was aware of its intended use, it fails to show agreement by Davis to participate in the affairs of the enterprise through two or more racketeering activities. *See United States v. Elliott,* 571 F.2d at 903. Davis' conviction on Count One is, therefore, reversed.

### Aiding and Abetting Possession of Destructive Device

Davis also challenges his conviction on Count Five for aiding and abetting the possession of a destructive device, the Rodriguez bomb.

The Government concession and our agreement that Davis was not shown to be a member of the conspiracy automatically require a reversal and new trial for Davis as to Count Five.

Both Haskew and Gene Radney, a Tampa bail bondsman, were permitted to give testimony about hearsay statements of alleged coconspirator Gispert which were prejudicial to Davis and not admissible without a showing that Gispert and Davis were coconspirators.

Davis argues that the other evidence was insufficient to support a guilty verdict and that he should be granted acquittal, rather than a new trial. His contention is as follows:

The Government failed to show knowledge or inferred knowledge on the part of the Appellant of his isolated transaction in supplying twenty (20) sticks of dynamite to GISPERT, under Count 1. In

addition, the Government has failed to show knowledge on the part of the Appellant that the dynamite would be used for a destructive device or that the Appellant formed the requisite willful intent as set forth in Count V, especially in light of the fact that mere possession of the substance dynamite, standing alone, would not be sufficient to warrant conviction, the reason being that dynamite is but one component of a destructive device.

Davis correctly points out that mere transfer of dynamite would not constitute a violation of 26 U.S.C.A. § 5861(b), and that act has not been charged in the indictment. Rather Davis has been charged with aiding and abetting the transfer or possession of dynamite, the blasting caps, battery and electrical switch. Clearly he actually handled only the dynamite.

■ A conviction based on aiding and abetting commission of a crime requires evidence that the defendant "was associated with the criminal venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed." *United States v. Martinez,* 555 F.2d 1269, 1272 (5th Cir. 1977). The defendant need not have participated in every phase of the criminal venture. *United States v. Hathaway,* 534 F.2d 386, 399 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). It is unnecessary that he have had knowledge of the particular means by which the principals in the crime would carry out the criminal activity. *United States v. Austin,* 585 F.2d 1271, 1277 (5th Cir. 1978).

In order to convict Davis, a jury would have to conclude that the dynamite handled by Davis was, in fact, that which was used in the destructive device described in Count Five, that Davis knew the dynamite was to be used in a destructive device and that he delivered the dynamite with the intent that such should be its use. *Cf. United States v. Malone,* 546 F.2d 1182 (5th Cir. 1977); *United States v. Posnjak,* 457 F.2d 1110 (2d Cir. 1972).

Francis Booth testified that Davis, who had assisted him on occasion in his well drilling business, telephoned him in late July 1975 and asked him for a case of dynamite. Booth called Davis back and said he would have dynamite on Monday. On Monday he telephoned Mrs. Davis who said she had taken Davis to the airport and arrived fifteen or twenty minutes later to pick up the dynamite herself. Booth claimed to have given her thirty or forty sticks. After Rodriguez' car was bombed on July 31, 1975, Booth went to see Davis and asked what he had done with the dynamite, saying he, Booth, was in trouble over it. Davis said he had given it to some "big, greasy-looking guy," and when Booth said he would have to tell who he had given the dynamite to, Davis replied, "Do what you have to do."

Two defense witnesses, Wade Lovelace and Darrell Mann, presented a carefully documented alibi defense showing Davis had left town on the day Booth delivered the dynamite and returned the day after the bombing.

 We need not speculate now on what the evidence at a new trial might show. It is enough to hold that the evidence without the hearsay has sufficient substance to support an inference that Davis knew the dynamite was to be used in a destructive device transferred in violation of the law, and that Davis is not entitled to an acquittal on this appeal. This decision makes unnecessary the consideration of the other two points of error asserted by Davis, that is, testimony about Davis' arrest for an unrelated crime and the prosecutor's comment on Mrs. Davis' failure to testify.

## ANTHONY ANTONE

Anthony Antone was charged in eleven of the twelve counts of the indictment and convicted as charged. He was convicted of the conspiracy and racketeering charges, four firearm counts, two automobile destruction counts, and one count each involving obstruction of justice, cocaine, and a counterfeit Federal Reserve note. He was given a combination of concurrent and con-secutive sentences totaling some 65 years and three years' special parole.

Although we have given Antone the advantage of review as to his convictions on all issues argued by other defendants that might taint his trial, we discuss here the major argument Antone makes: evidence obtained by an illegal search and seizure was improperly admitted and his convictions should be reversed.

Antone challenges three separate searches conducted at his residence. The searches took place on February 25, 1976 at the time of the arrest of Antone pursuant to a Florida arrest warrant charging him with the murder of Richard Cloud, on February 26, 1976 pursuant to a Florida search warrant, and on March 3, 1976 pursuant to a federal search warrant. Prior to trial defendant moved to suppress the evidence seized in all three searches. After an extensive hearing, the district court denied the motion. We affirm.

### February 25, 1976 Search

We conclude that two address books seized on February 25, 1976, were admissible under the "plain view" theory, were not tainted by other illegal seizures, and that, in any event, their admission was harmless beyond a reasonable doubt.

Antone's arrest was executed by a team of seven officers and agents. Three officers placed Antone under arrest at the front door while the others were deployed at strategic spots around the premises. Upon arrest, Antone was handcuffed and patted down for weapons. He was then seated on a couch in the living room which was first searched for weapons and/or evidence. Within two minutes of the arrest, Sergeant Fairbanks of the Tampa Police Department entered the room from the rear of the house where he had been stationed. Fairbanks guarded Antone while other officers swept through the house. Fairbanks observed two address books on an end table to Antone's right. Aware of the existence of other conspirators, Fairbanks recognized the significance of the address books and

opened them. Seeing that they were indeed relevant, he took possession of them. This seizure took place during the ten minute period that Antone was held at his home before being transported to the police station. It was during this period, as well, that another officer engaged in the sweep of the house seized photographs and telephone toll records lying on a desk in the dining area adjacent to the living room.

The Government argues that the address books should be admitted as products of a search incidental to a valid arrest. This exception to the Fourth Amendment warrant requirement has been carefully delimited by the Supreme Court in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), to permit a search of the person and the area within his or her immediate control for weapons or evidence which might be subject to destruction. In applying *Chimel*, this Court has looked to the particular circumstances of the arrest in order to determine whether a seizure was reasonable. *United States v. Jones*, 475 F.2d 723, 727–28 (5th Cir.), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973).

Here, although the address books were within Antone's reach, Antone was handcuffed and the record does not indicate there was any possibility that he could reach them. The address books cannot reasonably be said to have been in Antone's control.

The seizure of the address books is justified, however, on the plain view doctrine. Under this doctrine, evidence is admissible which is seized by an officer who has an independent justification for being present unconnected with a search directed against the accused and who inadvertently comes across an object which is obviously evidence. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Sergeant Fairbanks was guarding Antone during a sweep of the house for other persons. *See United States v. Cravero*, 545 F.2d 406, 417–18 (5th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977). His discovery of the address books was inadvertent and they were lying in plain view on a coffee table within reach of Antone.

Relying on *United States v. Robinson*, 535 F.2d 881, 885–86 (5th Cir. 1976), Antone contends that "plain view" does not apply because it was not until Fairbanks had leafed through them that he decided they were incriminating and took them into possession. In *Robinson* this Court held inadmissible stolen Treasury checks contained in a plain brown bag on the grounds that such an object cannot be said to be particularly indicative of criminal activity, especially where the original stop was unjustified and based upon a vague hunch. The facts differ in this case. Fairbanks knew that the prearrest investigation had implicated others and recognized that the address books might be of significance before he leafed through them.

Antone also argues that the address books are inadmissible because they have been tainted by other illegal seizures of toll call records and photographs during the same search. The trial court did not rule on the legality of the seizure of the telephone toll records and photographs because the Government represented that they would not be used at trial, thereby rendering the issue moot. *See United States v. Ragsdale*, 470 F.2d 24, 31 (5th Cir. 1972). If their seizure was improper, no taint would have affected the address books.

The seizure of the address books was entirely separate from the other seizures and was conducted by a different officer. The seizure of records and photographs did not lead to the seizure of the address books, and their only connection is that they occurred in the course of the same search. Defendant's burden of introducing "specific evidence demonstrating taint" is not met by such a showing. *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Pike*, 523 F.2d 734, 736 (5th Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).

We conclude the address books were properly admitted.

### February 26, 1976 Search

■ Antone's residence was searched pursuant to a state search warrant on February 26, 1976, and the following items were seized and used in evidence: counterfeit bills, miscellaneous papers taken from the dining room desk, a couch and projectile taken from it, pieces of air conditioning filters and photographs taken during the course of the search. Other items seized were not introduced into evidence. Antone complains that probable cause for issuance of the warrant was lacking, that the manner in which the search was conducted was defective, and that the improper seizure of several items tainted the entire search, rendering all items seized inadmissible. The trial court found that the affidavit supporting the warrant was sufficient and that the search was properly conducted as to the items introduced and moot as to all others. We agree.

■ The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." When the facts tending to show probable cause are provided by informants, the affidavit must pass a two-pronged test: the judge must be informed of some of the circumstances by which the informant became aware of the information, and facts must be shown by which a judge can make an independent determination of reliability. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

At issue here is the second prong. A coconspirator, Haskew, had informed the police of the presence of three projectiles in the walls or floors as a result of test-firing the Cloud murder weapon into a couch and of the presence of counterfeit currency in a secret door panel. The reliability of this information was well demonstrated. It contained sufficient detail as to the location of the couch and the place where the counterfeit currency was hidden to assure that the informant was in a position to observe the facts reported. *See United States v. Darensbourg,* 520 F.2d 985, 989 (5th Cir. 1975). The affiant had also listened to a conversation between Haskew and Antone regarding the counterfeit money which corroborated Haskew's statements about its presence. Furthermore Haskew's statements about testfiring the murder weapon would enhance the possibility of his conviction for complicity in the murder and thus were against his penal interest. *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Barfield,* 507 F.2d 53, 58 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975).

■ The contention that this information was not timely is not well taken. Timeliness must be determined in the light of the particular circumstances of each case. *United States v. Prout,* 526 F.2d 380, 386 n.5 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *United States v. Guinn,* 454 F.2d 29, 36 (5th Cir.), *cert. denied,* 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972). Although the information regarding the projectiles was four months old, there is considerable likelihood that the information was not stale. The floors and walls of a house are relatively permanent fixtures and would not likely be subject to removal over the period of four months.

Antone contends that the evidence should be suppressed because the affidavit contains inaccuracies and serious misrepresentations. It states that Major Heinrich, a participant in the arrest of Antone the previous day, had seen a couch in the den. Heinrich testified at trial that it had been observed in the living room rather than the den. The statement in the affidavit was not necessary to establish probable cause and a negligent misrepresentation, if there was one, would not invalidate the search. *United States v. Astroff,* 578 F.2d 133 (5th Cir. 1978) (en banc). Likewise the statement that the secret panel was located be-

hind the northeast bedroom door instead of in the northeast section of the northwest bedroom door or that the couch was said to be along the south wall instead of the north wall is insignificant. *Id. See also United States v. Darensbourg*, 520 F.2d at 987 n.2.

Antone suggests that it was more reasonable to conclude that the tape of the Haskew-Antone conversation refers to Antone's possession of narcotics rather than counterfeit currency and complains that the tape was not transcribed or otherwise made available to the magistrate issuing the warrant. Where the affiant himself had listened to the conversation, however, submission of the tape was unnecessary. The agent's conclusion that the conversation related to counterfeit currency was a reasonable one. Under these facts, the district court properly found that probable cause for the warrant existed.

Antone contends that the air conditioning filters should have been suppressed because the evidence reveals that the officers were searching for doorbells and air conditioning filters, objects which were not named in the warrant. The issue to be determined here is whether the district court properly determined that the principal purpose of the officer's search of the shed was for the projectiles named in the warrant and not the filters. Because it was obvious that the projectiles had been fired into the wall and that the wall had been recently removed and reconstructed, a search of the adjacent lumber-strewn shed for wood in which the projectile might be embedded was within the scope of the search. The warrant itself specified the house and curtilage which included the shed.

Antone suggests that the testimony of the police officers reveals two or three searches of the shed. A careful examination of the testimony, however, indicates that there was one search and inconsistent testimony regarding when it took place. This testimony also shows that the scope of the search was broadened only after the police were unable to find bullet holes in the wall. Based on this testimony, the district court was not clearly erroneous in its

conclusion that the object of the search of the shed was the projectiles described in the warrant. *United States v. Resnick*, 455 F.2d 1127, 1133 (5th Cir.), *modified on other grounds*, 459 F.2d 1390 (1972). Since the filters and bells were in plain view and the presence of the officers legitimate, the seizure and admission of these objects was proper.

We are not persuaded otherwise by the fact the police knew the shed contained air conditioning filters. The testimony of Agent Campbell, the affiant, showed that Haskew had informed him after the warrant had issued that the "stuff" used to pack a silencer could be found in a shed behind Antone's house and that Campbell was unaware of the significance of this information at that time. It was only during the course of the search that Campbell was apprised that blue fibers similar to those found in air conditioning filters had been found on the bullet holes in the screen door of the murder victim's residence by the Tampa police. Under these circumstances, the fact that the officers expected to find the filters does not make the seizure invalid. This is not a case where the officers maneuvered themselves into a position whereby they could obtain evidence without obtaining a search warrant for the object of their search. *United States v. Bolts*, 558 F.2d 316, 320 (5th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); *United States v. Cushnie*, 488 F.2d 81 (5th Cir. 1973), *cert. denied*, 419 U.S. 968, 95 S.Ct. 233, 42 L.Ed.2d 184 (1974).

Antone also contends that the fruits of this entire search should be suppressed because some of the items were improperly seized. The district court did not reach this issue, nor need we. Since the Government did not introduce these items into evidence, the issue is moot.

### March 3, 1976 Search

Antone challenges the validity of the March 3, 1976 search claiming the warrant was defective because the affidavit was based on the unconstitutional search of February 26, 1976 and there was a ministerial error in the inventory and receipt.

Our determination of the validity of the February 26 search pretermits the first argument. The second concerns the admission of a commode brush handle into evidence. Antone contends its admission was error because the item was not listed on the inventory accompanying the return nor on the receipt as required by Rule 41(d), Fed.R. Crim.P. This Court has held that defects in the return of a warrant are ministerial in nature and do not invalidate a search. *United States v. Wilson*, 451 F.2d 209, 214 (5th Cir. 1971), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1972). Antone's counsel was present during the search and advised of all items seized, and the item was viewed during pretrial discovery. There has been no showing of prejudice or intentional omission and the evidence need not have been suppressed.

Having examined the briefs and record for error as to Antone, we affirm his convictions on all counts.

## MANUEL GISPERT

Manuel Gispert was charged in eight counts of the indictment and acquitted on one. He was found guilty of seven counts: the conspiracy and racketeering counts, three firearm counts, and two automobile destruction counts. He was sentenced to concurrent terms of twenty years imprisonment on the first two counts, consecutive concurrent sentences of ten years on the three firearm counts, and consecutive concurrent sentences of twenty years on the two automobile destruction counts.

In addition to the arguments common to all defendants, Gispert asserts other grounds for error.

### Sufficiency of Evidence

Gispert's major sufficiency argument goes to the proof of his connection with the conspiracy and the racketeering enterprise. His argument reflects the mistaken belief that a RICO conspiracy conviction requires proof that each member was aware of all racketeering activities of each of his cohorts in the criminal enterprise. Gispert's argument is short-circuited by this Court's response to similar contentions in *United States v. Elliott*, 571 F.2d at 902–05, and merits no further discussion. A brief recapitulation of a portion of the evidence presented against Gispert will allay any doubts as to its sufficiency to support his conspiracy conviction.

Haskew's testimony indicates that Gispert supplied the .12 gauge shotgun for and accompanied Haskew on an unsuccessful expedition to find and shoot Manuel Garcia, accompanied Haskew in the trip to Yeehaw Junction to pick up dynamite for the Garcia car bomb, told Haskew they were to be paid $20,000 for the bombing, and joined Haskew in placing the bomb on Garcia's car. Haskew also testified that Gispert went to Miami with him in July 1975 to deliver cocaine to Frank Boni and shared in the proceeds from that transaction. Gispert and Haskew decided to fulfill the murder contract on Cesar Rodriguez by bombing, and Gispert helped position the bomb in that attempt on Rodriguez' life.

A careful review of the briefs and record reveal sufficient evidence to support Gispert's conviction on all counts.

### Denial of Bill of Particulars Motion

Defendant Gispert appeals the district court's denial of his motion for a bill of particulars seeking the time and date in June 1975 on which Gispert and others allegedly attempted to murder Manuel Garcia and the time and date in July 1975 on which Garcia allegedly hired Gispert to murder Cesar Rodriguez. The hiring for the murder of Rodriguez was alleged as overt act 14(g) in Count One of the indictment and the attempted murder of Garcia as overt act 14(a). Gispert also sought the time and date of ¶ 2(a)(1) of Count Two of the indictment, which paragraph recites the same act as overt act 14(a) of Count One. The same request was made as to his alleged receipt and possession of a silencer in Count Eight, but he was acquitted on that count and his claim is thus moot. *United States v. Radetsky*, 535 F.2d 556, 564 n.5 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

■ The purpose of a bill of particulars is, of course, to inform the defendant of the charge against him in sufficient detail that he may prepare a defense and to minimize surprise at trial. *United States v. Cantu*, 557 F.2d 1173, 1178 (5th Cir. 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). The denial of a bill of particulars rests within the sound discretion of the district court and can be reversed by this Court only upon demonstration that defendant was actually surprised at trial and thus incurred prejudice to his substantial rights by the denial. *United States v. Mackey*, 551 F.2d 967, 970 (5th Cir. 1977).

Defendant Gispert makes no claim that he was surprised or prejudiced at trial due to his lack of the information sought and refused. The lack of impairment to his defense is indicated by his acquittal by the jury on Count Eight. Furthermore we note that insofar as defendant's claim involves denial of a bill of particulars as to a conspiracy count, this Court has found that defendants are subjected to no prejudice in conspiracy trials where the Government proves overt acts not stated in the indictment or a bill of particulars. *United States v. Johnson*, 575 F.2d 1347 (5th Cir.), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed. 2d 454 (1979). Defendant complains generally that denial of the bill of particulars forced him to reconstruct his whereabouts and activities for the total time involved in the two allegations, at most two months. Defendant, however, cites no evidence in the record, nor have we found any, indicating that he sought to assert an alibi defense in which lack of precise times and dates would have prejudiced him.

■ We conclude that defendant Gispert has not demonstrated the abuse of discretion necessary for reversible error.

## LARRY NEIL MILLER

Miller was convicted of four counts: the conspiracy and substantive racketeering counts, one firearm count involving a silencer for a .32 automatic pistol, and one count involving a counterfeit Federal Reserve note. He received concurrent terms of twenty years imprisonment on the first two counts and consecutive terms of five years imprisonment on the other two counts for a total of thirty years imprisonment, all sentences to be served concurrently with a previously imposed state sentence. We affirm his convictions. In addition to joining with the other appellants in asserted errors common to all defendants, Miller argues several points which we discuss *seriatum*.

### Sufficiency of Evidence

■ Miller's main attack on the sufficiency of the conspiracy and racketeering counts centers on the argument that there was more than one conspiracy and that the evidence failed to show a unified criminal enterprise. We have dealt with that contention elsewhere in this opinion.

Miller's knowing participation in the affairs of the enterprise was amply demonstrated. The Government introduced evidence linking Miller, at least indirectly, to almost every aspect of the enterprise's affairs and showing his direct participation in at least two of the enterprise's racketeering activities.

Willie Noriega testified that he met with Miller and Gispert in late April 1975 and Miller asked him if he could obtain explosives. When Noriega asked Miller what Gispert intended to do with the dynamite, Miller replied "that he was not going to play with it."

Haskew testified that in early October he asked Miller to obtain ammunition for a .32 caliber pistol. Miller supplied the bullets and he and Haskew then test-fired the weapon which was equipped with a silencer. While Haskew did not tell Miller that the gun and bullets were to be used in the Cloud murder, Haskew testified that Miller knew when he supplied the bullets that the gun had a silencer, and Haskew added, "Why does a person have bullets for a gun with a silencer unless they're going to kill someone?"

On October 15 Miller, Haskew and Gilford committed an armed robbery, the proceeds of which were shared with Antone.

In mid-November, Haskew gave Miller a large quantity of amphetamines which he had stolen in Miami. Miller sold the pills and eventually paid Haskew $4,000–$6,000.

Haskew, through defendant Davenport in Miami, was also the source of counterfeit money passed by Miller in a department store in Clearwater, Florida in late December 1975. Edward Loocerello, a witness apparently involved in another unrelated counterfeit money violation, testified that Miller had approached him in mid-December and asked if he could handle some counterfeit money of which Miller claimed to have an unlimited supply. Miller said the money was coming from Miami and advised Loocerello to avoid Clearwater because it was "burnt up," meaning someone was already passing counterfeit money there.

Haskew testified, finally, that in January 1976 Miller asked him to obtain a silenced weapon. Miller indicated that he and Scarface Rivera needed a quiet weapon to make a hit on someone who lived in a trailer.

Miller also challenges the evidence to support his conviction on that count of the indictment in which Miller, Antone, Gispert, Haskew, and Gilford were charged with possession of a silencer in violation of 26 U.S.C.A. §§ 5861(b) and (d), the silencer having been transferred to them without compliance with the requirements of § 5812(a). This was the weapon that was used in the murder of Richard Cloud.

Miller contends that he never received the silencer by "transfer," as defined in 26 U.S.C.A. § 5845(j) and that such a transfer is a precondition to his liability under 26 U.S.C.A. § 5861(b). Section 5845(j) defines transfer to include "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of." Section 5812(a) prescribes a series of steps which must be taken in order to transfer a weapon. Subsection (b) of § 5861 makes it unlawful for one to receive or possess a firearm transferred to him in violation of the statutory provisions. Subsection (d) prohibits one from receiving or possessing a firearm not registered to him in the National Firearms Registration and Transfer Record in accord-ance with 26 U.S.C.A. §§ 5841(a) and (b). While subsection (d) reaches any person in possession of a registrable gun which is not registered in accordance with the Act, *United States v. Stella*, 448 F.2d 522, 524 (9th Cir. 1971); *United States v. Palmer*, 435 F.2d 653, 656 (1st Cir. 1970), subsection (b) requires proof of the additional element of a transfer in violation of the Act. *United States v. Ponder*, 522 F.2d 941, 944 (4th Cir.), *cert. denied*, 423 U.S. 949, 96 S.Ct. 369, 46 L.Ed.2d 285 (1975).

Miller does not contest the sufficiency of the evidence of his possession of the silencer. Miller exercised dominion and control over the silencer at least at the time he test-fired the weapon, and possession need only be momentary. *United States v. Parker*, 566 F.2d 1304, 1306 (5th Cir.), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978). *See also United States v. Richardson*, 504 F.2d 357, 360 (5th Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1406, 43 L.Ed.2d 659 (1975).

Haskew's testimony suggested that the silencer was made by a friend of Victor Acosta and that defendant Antone obtained the silencer from Acosta and gave it to Haskew. Either Antone, Haskew, or both were transferees of the unregistered silencer. The transfers of the silencer for use in the Cloud murder were clearly acts in furtherance of the ongoing criminal conspiracy and thus the transfer to one conspirator was a transfer to all. The evidence was sufficient to support Miller's conviction on this count.

Miller does not contest the sufficiency of the evidence to convict him of the count involving the counterfeit Federal Reserve note.

### Admissibility of "Fifth Hit" Testimony

Defendant Miller objects to the admission of testimony by Haskew that Miller approached him in late January 1976 seeking to obtain a gun with a silencer to use in making a hit. This evidence is irrelevant, Miller argues, because no connection has been established between this "hit" and the

conspiracy. Its prejudicial effect is clear, Miller adds, from the implication that Miller was directly involved in a murder.

The Government asserts the relevance of this evidence on the so-called "fifth hit" theory. Haskew testified that in September 1975 Antone told him that Victor Acosta was offering five murder contracts for $15,000 each. Antone named Bernard Dempsey, Cesar Rodriguez, and Richard Cloud as three of the victims. The other two were not named. The Government proposes that one of the two was Francis Booth. Booth had supplied Davis with the dynamite used in the Rodriguez bombing on July 31, 1975. After learning of the explosion, Booth had confronted Davis and said he would have to tell the authorities. Booth also testified that he lived in a trailer from July through November 1975. In Haskew's account of Miller's request for the silenced weapon, Miller had stated that it was to be used to shoot the occupant of a trailer because he was going to testify against them. Although Miller was incarcerated in late January 1976 on a state conviction, as late as February 1976 Gilford was still soliciting assistance for the murder of someone who he said lived in a trailer.

Miller attempts to show the Government knew, in fact, Booth was not the intended "fifth hit" because a confidential source had informed the F.B.I. in March 1976 that the four targets remaining after Cloud's death were Garcia, Rodriguez, Dempsey and a federal prosecutor, none of whom, to our knowledge, lived in a trailer at any time relevant here. This testimony is not in conflict with the Government's theory except in the number of remaining murder targets. Garcia remained as the enterprise's initial target pursuant to the outstanding contract supposedly issued by Diecidue, and of Acosta's five targets, only Cloud had been murdered. Furthermore Gilford, who was an active participant in the contract murder operation, stated in a February 1976 conversation recorded by the F.B.I. that among the remaining murder contracts were an attorney, a bar owner and a man who lived in a trailer.

We cannot say that the trial judge abused his discretion in admitting this "fifth hit" testimony as relevant to the contract murder operation which was central to the charged conspiracy.

### Admissibility of In-Court Identification

Defendant Miller argues that the trial court erred in admitting witness Linda Marcotte's in-court identification of Miller over his objection to the taint of an impermissibly suggestive photo-spread used in an earlier identification made by the witness. We find Miller's contention meritless.

The standard for assessment of photographic identification procedures provides:

> [A] pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The *Simmons* standard is applied as a two-step analysis by this Court, *United States v. Smith,* 546 F.2d 1275, 1279 (5th Cir. 1977), whereby the judge need determine the likelihood of irreparable misidentification only after finding the photo-spread impermissibly suggestive.

Seven black and white "mug shots" were shown to Linda Marcotte, the department store clerk who accepted a counterfeit hundred dollar bill in December 1975. All but one, which was not of Miller, contained frontal and profile views, and all depicted white males of differing facial and feature characteristics but of the same general age and description. The photographs were shown to the witness one at a time, unaccompanied by any remark or gesture which might have influenced her selection. The witness went through the photographs once, identified the photograph of Miller and attested to the certainty of her selection.

We are unable to conclude that the trial court was clearly erroneous in its determination that the photo-spread was not impermissibly suggestive. Furthermore, even

had the photographs been so dissimilar as to be "impermissibly suggestive," the risk of misidentification at trial was minimal. *See Bloodworth v. Hopper*, 539 F.2d 1382, 1383–84 (5th Cir. 1976). The witness had been able to observe Miller in the department store for 15–20 minutes while assisting him with a purchase, and she showed no hesitation in identifying Miller either by photograph or in court.

Miller has also adopted all applicable arguments made by the other defendants in this appeal. Having considered all arguments for reversal, we affirm Miller's conviction.

In summary, we reverse the convictions of Diecidue on Counts One and Two for insufficiency of evidence, requiring dismissal of these counts against him. We reverse Diecidue's convictions on Counts Three and Four due to improper admission of hearsay testimony and remand for a new trial on those counts.

We reverse the conviction of Boni on Count One because of insufficient evidence, and the indictment against him must be dismissed.

We reverse Davis' conviction on Count One for insufficient evidence, requiring dismissal of that count against him. Davis' conviction on Count Five is reversed because hearsay testimony was improperly admitted against him, and a new trial is ordered on that count.

All convictions of Antone, Gispert and Miller are affirmed.

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.

GODBOLD, Circuit Judge, concurring in part and dissenting in part:

I concur except on one issue. I would hold that Count One of the indictment is insufficient.

I have read Count One right side up, upside down, and sideways, and I have dissected it and parsed it. I cannot make sense of what it says or divine what it is intended to say. It is not possible to tell whether it charges that defendants were already engaged in an existent enterprise and in the pursuit of it engaged in racketeering activities, or in the pursuit of it conspired to engage in racketeering activities; or, whether they conspired to form an enterprise in which they would engage in racketeering activities; or, engaged in a conspiracy in the conduct of which they conspired to conspire; or, as the majority seem to read the count, they formed an enterprise and simultaneously formed a conspiracy. There are various other possibilities as well. Count One speaks in circles. Its deficiencies are not trivial because they affect both constitutional and statutory limitations of the Organized Crime Control Act. Also, Count One does not even come close to being a "plain, concise and definite statement." Fed.R.Crim.P. 7.